955 F.2d 641
 60 USLW 2558, 1992-1 Trade Cases P 69,703
 CITY OF CHANUTE, KANSAS; City of Auburn, Kansas; City of
Cleveland, Oklahoma; City of Garnett, Kansas; City of
Humboldt, Kansas; City of Iola, Kansas; City of Neodesha,
Kansas; City of Osage, Kansas, Plaintiffs-Appellants,
v.
WILLIAMS NATURAL GAS COMPANY, Defendant-Appellee.
 Nos. 90-3273, 90-3313, and 90-3369.
 United States Court of Appeals,
Tenth Circuit.
 Jan. 30, 1992.
Rehearing Denied March 27, 1992.
 
 Charles F. Wheatley, Jr. (Don Charles Uthus, Peter A. Goldsmith, Timothy P. Ingram, Pace J. McConkie, and Allen D. Freemyer of Wheatley & Ranquist, Annapolis, Md., Larry D. Hendricks and Ronald Greg Wright of Stumbo, Stumbo, Hanson & Hendricks, Topeka, Kan., Robert Pennington of Henshall, Pennington & Brake, Chanute, Kan., with him on the briefs) of Wheatley & Ranquist, Annapolis, Md., for plaintiffs-appellants.
 John T. Schmidt (Mary J. Rounds of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Okl., and C. Kevin Morrison of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Washington, D.C., Donald W. Bostwick and Teresa James of Adams, Jones, Robinson & Malone, Chartered, Wichita, Kan., Lewis A. Posekany, Gen. Counsel, Williams Natural Gas Co., Tulsa, Okl., Bobby E. Potts, Associate Gen. Counsel, and William J. Sears, Chief Regulatory Counsel, The Williams Companies, Inc., Tulsa, Okl., with him on the briefs) of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Okl., for defendant-appellee.
 Before SEYMOUR, BARRETT and BRORBY, Circuit Judges.
 BRORBY, Circuit Judge.
 
 
 1
 In this antitrust case, eight cities ("the Cities"), sued Williams Natural Gas Company ("Williams") asserting Sherman Antitrust Act ("Sherman Act") violations. Specifically, the Cities protest Williams' decision to terminate a temporary program whereby the Cities could purchase gas from third party suppliers which Williams would transport over its pipeline. The district court granted summary judgment in favor of Williams. We affirm.BACKGROUND[1]
 
 
 2
 The Cities purchase natural gas at wholesale and then resell it to customers located in the cities and surrounding areas. Williams owns and operates the only interstate pipeline serving the Cities. Each of the Cities has had a "full requirements" contract with Williams. These contracts require the Cities to purchase all their natural gas from Williams and Williams agrees to have a sufficient supply of natural gas to meet the Cities' demands. In December 1986, Williams sought regulatory approval to allow it to transport gas from third party suppliers on a permanent basis.[2] At the time, under the full requirements contracts, Williams only transported its own gas over the pipeline. While awaiting approval, Williams initiated a temporary program to transport third party gas for the Cities.[3] FERC granted Williams approval to waive the full requirements provisions in existing contracts with the Cities to effectuate this temporary program. Otherwise, these full requirement provisions would have precluded the Cities from being able to purchase gas from third party suppliers even though Williams would transport the gas over its pipeline. This waiver did not relieve Williams from its obligation to serve the Cities' full requirements on demand. The Cities began to negotiate and enter into agreements for gas from other suppliers. During the time the temporary program was in effect, while the Cities were purchasing third party gas, Williams experienced difficulty paying its suppliers.[4]
 
 
 3
 Originally, the temporary program was to run from December 1986 until May 1987. Williams was able to extend it until August 1, 1987, when Williams ended its temporary program and closed its pipeline to those alternate suppliers ("closed period"). However, FERC regulation obligated Williams to transport certain third party gas ("approved third party suppliers") that was still available to the Cities.[5] In July 1988, FERC approved Williams' permanent plan, which enabled the Cities to once again purchase gas from any third party supplier. Thereafter, the Cities negotiated with other third party suppliers to obtain gas which Williams would transport over its pipeline.
 
 
 4
 The Cities brought suit alleging Williams violated §§ 1 and 2 of the Sherman Act. The Cities sought antitrust damages for the time period Williams closed its pipeline to the transportation of third party gas, August 1987 until July 1988. The district court granted summary judgment for Williams. The Cities appeal asserting seven errors, which we address separately.
 
 I. SUMMARY JUDGMENT
 
 5
 We recognize the prevailing sentiment that summary judgment should be used sparingly in antitrust cases. See Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, when the moving party identifies evidence that demonstrates no genuine issue of material fact remains, the nonmoving party must go beyond the pleadings and present to the court the specific evidence that indicates a genuine factual issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). The existence of some disputed facts does not automatically preclude granting summary judgment. Anderson, 477 U.S. at 247-48, 106 S.Ct. at 2509-10. If the nonmoving party does not make a sufficient showing of a material fact, all other facts are rendered immaterial and summary judgment is appropriate. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552. We remain mindful that summary judgment in antitrust cases is disfavored. Fortner Enters., Inc. v. United States Steel Corp., 394 U.S. 495, 505, 89 S.Ct. 1252, 1259, 22 L.Ed.2d 495 (1969).
 
 
 6
 Reviewing a grant of summary judgment on appeal, "[w]e apply a de novo standard of review to the court's conclusions of law," and view the "record liberally in favor of the party opposing the motion for summary judgment." McKenzie v. Mercy Hosp., 854 F.2d 365, 367 (10th Cir.1988). See also Anderson v. Health & Human Servs., 907 F.2d 936, 946-47 (10th Cir.1990). We are not limited to the grounds upon which the trial court relied but may base summary judgment on any proper grounds found in the record to permit conclusions of law. United States v. Colorado, 872 F.2d 338, 339 (10th Cir.1989). The trial judge must deny a summary judgment motion when reasonable jurors might disagree, even if the judge would find for the moving party. Dreiling v. Peugeot Motors of America, Inc., 850 F.2d 1373, 1377 (10th Cir.1988). Thus, where the reviewing judge may properly draw different ultimate inferences, summary judgment cannot be entered. Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co., 817 F.2d 639, 644 (10th Cir.1987). Because summary judgment involves purely legal determinations, we review the district court's decision to grant summary judgment de novo. Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir.1991).
 
 II. ESSENTIAL FACILITIES DOCTRINE
 
 7
 The Cities allege Williams' decision to close the pipeline violated § 2 of the Sherman Act which prohibits monopolies in interstate trade or commerce. 15 U.S.C. § 2. One way federal courts enforce this prohibition is through the use of the essential facilities doctrine. McKenzie, 854 F.2d at 368-69. The essential facilities doctrine is a test courts can apply to alleged monopolistic conduct to determine whether the conduct violates the antitrust laws. Federal courts of appeals have adopted a four-part test to determine if a monopolist's conduct violates § 2 under this doctrine. Id. at 369. To prevail under the essential facilities doctrine the Cities must show: (1) Williams is a monopolist in control of the pipeline that is essential to competition in the retail natural gas market; (2) the Cities' inability to duplicate, practically or reasonably, the pipeline access; (3) Williams has denied the Cities use of the pipeline; and (4) the feasibility of Williams providing the pipeline to the Cities. See MCI Communications Corp. v. American Tel. & Tel. Co., 708 F.2d 1081, 1132-33 (7th Cir.), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).
 
 
 8
 The Cities presented evidence they competed with Williams at the retail level for new users and larger commercial and industrial users. The undisputed facts show Williams operated the only natural gas pipeline in the area of the Cities. Economically, it was not feasible for the Cities to physically duplicate the pipeline. Chanute I, 678 F.Supp. at 1533. Williams temporarily closed its pipeline to the transportation of third party gas even though the Cities either had long term contracts or were negotiating long term contracts for that third party gas. Id. at 1521. Williams did not close the pipeline because of FERC regulations. Once Williams closed its pipeline, it entered into new five-year contracts with the Cities which required the Cities to pay demand charges year-round even if they purchased no gas from Williams. Williams' gas was more expensive than the other third party suppliers' gas. The approved third party suppliers' gas that Williams continued to transport was short-term and interruptible,[6] whereas the other third party suppliers provided long term, firm and much cheaper gas.[7] Id. at 1521.
 
 
 9
 Williams moved for summary judgment bringing evidence that as an interstate pipeline, it is subject to "pervasive regulation" by FERC. Id. at 1522. During the closed period, Williams provided all the Cities' natural gas requirements and transported approved third party suppliers' gas. The Cities received offers from those approved third party suppliers but did not consider any purchases. The price at which Williams offered gas to the Cities was regulated by FERC under the "just and reasonable" standard. 15 U.S.C. § 717c(a) (1988); Chanute I, 678 F.2d at 1523. For purposes of its summary judgment motion, Williams even assumed it was a monopolist in control of an essential facility.
 
 
 10
 The district court applied the essential facilities doctrine and granted summary judgment because the Cities were unable to establish two elements of the test: a competitor's inability practically or reasonably to duplicate the facility, and the denial of use of the facility to the competitor. The Cities assert as error: (1) the district court ignored its own findings made at the preliminary hearing, namely, evidence showed the facility could not be physically duplicated and the approved third party suppliers' gas was not a feasible substitute for other third party gas; and (2) at least a genuine issue of fact exists whether the approved third party suppliers' gas was a feasible alternative to other third party gas.[8]
 
 
 11
 We hold the Cities have failed to meet their burden under the essential facilities doctrine. It is the Cities "task to demonstrate the presence of all these elements.... If even one element is absent, [their] argument under the [essential facilities] doctrine is unavailing." McKenzie, 854 F.2d at 370. To establish elements two and three of the doctrine, the Cities must show Williams did not provide access to its pipeline on reasonable terms, equivalent to a denial of access. United States v. Terminal R.R. Ass'n, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912). Access to an essential facility must be "upon such just and reasonable terms and regulations as will, in respect of use, character and cost of service, place every such company upon as nearly an equal plane as may be with respect to expenses and charges as that occupied by the proprietary companies." Id. at 411, 32 S.Ct. at 516. In other words, the Cities must present evidence Williams denied or limited access to its pipeline solely to gain a competitive edge.[9] Any denial of the pipeline must result in a "severe handicap" to the competitor Cities. Twin Labs., Inc. v. Wieder Health & Fitness, 900 F.2d 566, 568 (2d Cir.1990). The Cities have not met this burden.
 
 
 12
 "As the word 'essential' indicates, [the Cities] must show more than inconvenience, or even some economic loss; [they] must show that an alternative to the facility is not feasible." Id. at 570. The undisputed facts show the Cities have not met such an onerous burden. The Cities have failed to show any "severe handicap" endured as a result of Williams providing the Cities' full requirements of natural gas as opposed to transporting third party gas. During the time Williams closed the pipeline, it still supplied the Cities' full requirements of natural gas. Although Williams' gas was more expensive than other third party suppliers, that in and of itself does not make the Cities' access to the pipeline unreasonable. Nor does it follow that access during the closed period was unreasonable simply because the price of Williams' gas was higher under the new contracts with the Cities. Williams provided the Cities' full gas requirements during the closed period at FERC approved prices. Furthermore, the Cities could have obtained cheaper third party gas during the closed period from a number of approved third party suppliers.
 
 
 13
 The Cities assert they lost long term, low price gas contracts with third party suppliers because of Williams' conduct. The Cities also contend the approved third party suppliers' gas did not meet their requirements. As a matter of law, we find Williams' supply of gas at FERC approved prices provided the Cities with reasonable access to the pipelines. This conclusion is strengthened by the fact Williams would also have transported less expensive gas from the approved third party suppliers. The Cities have not presented facts that show anything other than inconvenience or economic loss. The Cities suffered no "severe handicap" as a result of Williams' temporary closure, and once Williams reopened the pipeline, the Cities were able to obtain new contracts with third party suppliers. Accordingly, the Cities did not establish the second and third elements of the essential facilities doctrine. Reasonable access defeats the second element of the test because if the Cities have reasonable access it follows they can "practically ... duplicate the facility." Id. at 568. The third element, denial of use of the facility is also defeated where the Cities have reasonable access to the pipeline. The undisputed evidence shows Williams provided reasonable access to the pipeline. We hold the district court did not err by granting summary judgment on this issue.
 
 
 14
 The Cities' assertion the district court ignored its previous factual findings is irrelevant. In a summary judgment proceeding, the district court is not bound by its prior factual findings determined in a preliminary injunction hearing. See Fed.R.Civ.P. 54(b); University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981); Lindsey v. Dayton-Hudson Corp., 592 F.2d 1118, 1121 (10th Cir.), cert. denied, 444 U.S. 856, 100 S.Ct. 116, 62 L.Ed.2d 75 (1979).
 
 
 15
 The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits....
 
 
 16
 Camenisch, 451 U.S. at 395, 101 S.Ct. at 1834 (citation omitted). Thus, the fact the Cities prevailed at the preliminary injunction stage is not determinative in a summary judgment proceeding. We are affirming the grant of a summary judgment motion. Simply because the trial court may have weighed evidence differently at different stages of the proceedings does not establish a genuine issue of fact.
 
 
 17
 Nor is the Cities' argument persuasive that a genuine issue of fact remains whether the approved third party suppliers' gas was a feasible alternative to other third party gas. As noted above, to be so unreasonable to rise to a denial of access the Cities must suffer "severe handicap." Although the approved third party suppliers' gas may not be an exact substitute, it is not so unreasonable as to cause the Cities a "severe handicap." Furthermore, we have concluded the gas Williams itself provided was reasonable enough access to defeat the Cities' claim.
 
 III. TYING CLAIM
 
 18
 The Cities claim Williams' refusal to transport gas unless the Cities purchased Williams' gas constituted an illegal tying arrangement in violation of § 1 of the Sherman Act which prohibits "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. One way the courts analyze § 1 violations is to look for the existence of a tying arrangement. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); McKenzie, 854 F.2d at 368 n. 9. These arrangements do not pass antitrust scrutiny when the seller has the market power to "force" the purchaser to do something he would not do in a competitive market. Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 13-14, 104 S.Ct. 1551, 1558-59, 80 L.Ed.2d 2 (1984). The Cities assert the requirements contracts tied natural gas transportation (tying product) to the natural gas sales market (tied product).
 
 
 19
 Williams moved for summary judgment asserting the Cities were not "forced" to purchase Williams' natural gas to obtain transportation service and the Cities cannot show Williams had an economic interest in the tying product.
 
 
 20
 The district court granted summary judgment finding the Cities failed to show any agreement between two or more parties and Williams did not "force" the Cities to buy its natural gas. Chanute II, 1990-1 Trade Cas. p 68,967 at 17. The Cities assert: (1) the district court erred by not finding the existence of the necessary agreement between parties because the requirements contracts between Williams and the Cities constitute the necessary agreement; and (2) the approved third party suppliers' gas does not provide a defense to Williams "forcing" the sale of its natural gas.
 
 
 21
 Before they can establish a § 1 violation, the Cities "must prove an agreement ... between separate parties to restrain trade." Smith Machinery Co., Inc. v. Hesston Corp., 878 F.2d 1290, 1294 (10th Cir.1989), cert. denied, 493 U.S. 1073, 110 S.Ct. 1119, 107 L.Ed.2d 1026 (1990). The Cities must show the alleged tying arrangement is "concerted activity by individual actors." Card v. National Life Ins. Co., 603 F.2d 828, 834 (10th Cir.1979). A violation of § 1 requires " 'unlawful conduct by two or more parties pursuant to an agreement.... Solely unilateral conduct, regardless of its anticompetitive effects, is not prohibited.' " McKenzie, 854 F.2d at 367 (quoting Contractor Utility Sales Co. v. Certainteed Prods. Corp., 638 F.2d 1061, 1074 (7th Cir.1981)). "[A] business retains the right under section 1 to unilaterally announce the terms on which it will deal." Reazin v. Blue Cross & Blue Shield of Kansas, Inc., 899 F.2d 951, 963 (10th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990). The Cities assert the requirements contract between Williams and the Cities entered into after the pipeline had been closed is a sufficient showing of an illegal agreement.[10]
 
 
 22
 The Cities' assertion is erroneous. We held in McKenzie that a tying arrangement imposed by a single entity is not proscribed by § 1 of the Sherman Act. McKenzie, 854 F.2d at 368. In that case, the plaintiff asserted "an arrangement which links two separate and distinct product markets together" is sufficient proof of a tying arrangement. Id. We disagreed and held the plaintiff must make a preliminary showing of a conspiracy between two persons. Id. at 367-68. The Cities have only brought evidence that establishes Williams tied its natural gas to its transportation facilities. The Cities have not shown Williams acted in concert with any other entity. The Cities name only one defendant. The other parties to the allegedly illegal contracts to establish the conspiracy are the Cities themselves. We conclude the Cities have failed to make the requisite preliminary showing of a conspiracy to go forth with their tying claims under § 1 of the Sherman Act and find summary judgment is appropriate.[11]
 
 IV. RECOVERY UNDER THE CLAYTON ACT
 
 23
 The Cities claim they suffered antitrust injury entitling them to treble damages under § 4 of the Clayton Act which allows recovery of treble damages if the plaintiff can show it has been "injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a) (1988).
 
 
 24
 The Cities contend the full requirements contracts themselves are violative of antitrust law and the Cities are therefore entitled to treble damages. The Cities argue the fact that the contracts obligated them to purchase all their gas from Williams cannot immunize Williams from the antitrust injury caused by enforcing the allegedly illegal contracts. "[T]he thrust of the antitrust laws cannot be avoided merely by claiming that the otherwise illegal conduct is compelled by contractual obligations. Were it otherwise, the antitrust laws could be nullified." Loew's, 371 U.S. at 51, 83 S.Ct. at 105. Alternatively, the Cities suggest even if the requirements contracts themselves do not violate the antitrust laws, Williams waived the Cities' full requirements obligation. Therefore, the contracts did not preclude the Cities from suffering an antitrust injury because the Cities had a legal right to purchase third party gas.
 
 
 25
 Williams moved for summary judgment asserting six of the Cities had full requirements contracts for all or part of the relevant period[12] and therefore did not have standing to allege antitrust injury. In other words, § 1 of the Sherman Act is interpreted to prohibit only "unreasonable restraints" on trade. Reazin, 899 F.2d at 959. Williams asserts closing the pipeline did not unreasonably restrain natural gas trade because the Cities were contractually obligated to purchase all their gas from Williams. Accordingly, closing the pipeline to third party gas did not injure the Cities, because the Cities had no legal right to purchase third party gas.
 
 
 26
 The district court granted summary judgment and found due to the extant full requirements contracts the Cities did not suffer any antitrust injury. The Cities therefore lacked standing to recover treble damages under § 4 of the Clayton Act.[13] On appeal the Cities assert: (1) contract immunity is not a defense to a claim of antitrust injury; and (2) the court erred by ruling the failure to list damages for the cutoff of third party gas in the pretrial order barred the Cities from recovering them.
 
 
 27
 First, the Cities assert the original full requirements contracts are in violation of § 1 because they unreasonably restrain trade. The Cities argue the alleged illegal contracts provide the basis for them to recover Clayton Act damages. As proof, the Cities offer they were forced to accept the contracts as Williams was the only pipeline available to them. We disagree.
 
 
 28
 We examine the contracts to see if they violate the antitrust laws under one of two standards: (1) whether the contract is a per se violation or (2) whether the purpose or effect of the contract is to unreasonably restrain trade. Cayman Exploration Corp. v. United Gas Pipeline Co., 873 F.2d 1357, 1359-60 (10th Cir.1989). Many per se violations have been found in horizontal or vertical price fixing schemes. Key Fin. Planning Corp. v. ITT Life Ins. Corp., 828 F.2d 635, 640 (10th Cir.1987). Because we have no evidence of such a scheme or otherwise blatantly egregious conduct, we examine the purpose or effect of the contract under the standard typically termed the Rule of Reason. Under this rule, the court examines "whether the challenged agreement is one that promotes competition or one that suppresses competition." National Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). The Cities bear the burden of proving their full requirements contracts with Williams had an adverse effect on competition. Smith Machinery, 878 F.2d at 1298. The key inquiry is whether the Cities can support the existence of an actual "adverse effect on competition" with more than conclusory allegations. Key, 828 F.2d at 642.
 
 
 29
 The Cities did not produce evidence of the effect the contracts had on competition. Instead, they offered evidence of the effect the contracts had on the Cities themselves. The Cities offered no evidence that other gas suppliers would have sold to them but for the existence of their contracts with Williams. Mere allegations of anticompetitive effect are insufficient to require application of the rule, because there are no facts that could support a finding of an antitrust violation. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Therefore, as the Cities have failed to provide evidence to withstand a summary judgment motion, the contracts cannot provide a basis for the Cities to recover Clayton Act damages.
 
 
 30
 Next, we determine whether the Cities have any standing to recover under § 4 of the Clayton Act. Whether a plaintiff has standing to bring a cause of action is a question of law for the court to determine. Motive Parts Warehouse v. Facet Enters., 774 F.2d 380, 389 (10th Cir.1985). In this circuit, we determine standing in antitrust cases by applying a two-prong test. To meet the first prong the Cities must allege a business or property injury, an antitrust injury, as defined by the Sherman Act. Id. An antitrust injury is defined as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). "A violation of the Act without resultant injury to the [plaintiff] is insufficient to confer standing." Central Nat'l Bank v. Rainbolt, 720 F.2d 1183, 1187 (10th Cir.1983).[14] To establish the second prong of antitrust standing, the Cities must show the antitrust injury resulted directly from Williams' violation of antitrust law. Facet, 774 F.2d at 389.[15]
 
 
 31
 To determine whether the Cities' alleged injury--inability to purchase third party gas--meets the first prong of the test as an antitrust injury we examine the alleged antitrust violation. The Supreme Court has determined claims of antitrust injury "are compensable only when the injury flows directly from the unlawful act." Axis, 870 F.2d at 1107. The injury must occur not only "by reason of" the act, but also "by reason of" that which made the act unlawful. Brunswick, 429 U.S. at 488, 97 S.Ct. at 697.
 
 
 32
 The alleged unlawful act in this case is temporarily closing the pipeline to the transportation of third party gas. However, if Williams had not waived the full requirements contract provisions with the Cities, the Cities would have suffered the same injury--inability to purchase third party gas. By closing the pipeline, Williams did not violate the antitrust laws by unreasonably restraining trade. Had Williams never instigated the temporary program that allowed the Cities to purchase third party gas, the Cities would have suffered the same consequences. "If a monopolist does extend a helping hand, though not required to do so, and later withdraws it" no antitrust liability is incurred. Olympia Equip. Leasing Co. v. Western Union Tel. Co., 797 F.2d 370, 376 (7th Cir.1986), cert. denied, 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987). Williams was not obligated to provide the temporary program. Williams provided the temporary program pursuant to FERC approval, not FERC requirements.[16] Nor was Williams required to obtain FERC approval to withdraw its temporary program. See Williams Natural Gas Co., 43 FERC (CCH) p 61,227 (May 5, 1988); ANR Pipeline Co., 39 FERC p 61,341 at 61,077 (June 19, 1987). Consequently, Williams' decision to close the pipeline did not result in an antitrust injury to the Cities because Williams was not obligated to institute a temporary program in the first place. Thus, the Cities have not established the first prong of the antitrust standing test--an antitrust injury.
 
 
 33
 The Cities attempt to characterize Williams' waiver of the full requirements contract provisions as a permanent waiver. In this case the Cities claim they suffered an antitrust injury because once Williams closed the pipeline they were still entitled to receive third party gas. However, the Cities have provided no facts upon which we can conclude Williams' waiver was permanent. Williams requested a "temporary waiver of the full requirements provisions" of its contacts with the Cities. Northwest Central Pipeline Corp.,[17] 36 FERC p 61,371 at 61,907 (September 26, 1986). FERC granted the waiver to enable Williams to implement its temporary program. Id. Although in a later order FERC recognized Williams had the authority to revoke its decision to close the pipeline, this does not indicate FERC found the waiver to be in effect when the temporary program was not. See Williams Natural Gas Co., 42 FERC p 61,189 (February 19, 1988). Because FERC granted the waiver for the purpose of implementing the temporary program, once the program terminated so did the waiver. Accordingly, the Cities' full requirements obligations resumed once the pipeline was closed. The Cities have not persuaded this court they suffered an antitrust injury due to Williams closing the pipeline when Cities had no right to purchase third party gas due to the effect of the full requirements provisions. The Cities have failed to establish an antitrust injury as required by the first prong of the standing test. Thus, we do not reach an examination of whether the alleged antitrust injury resulted directly from Williams' violation of the antitrust laws.
 
 
 34
 Because we conclude the Cities lack standing to recover under § 4, we need not reach the Cities' second claim of error that the district court should not have barred their recovery because the damages were not set out in the pleadings or pretrial order.
 
 V. MONOPOLIZATION CLAIM
 
 35
 The Cities assert a monopolization claim under § 2 of the Sherman Act. 15 U.S.C. § 2. To establish a claim of monopolization under § 2, the Cities must show Williams had "the possession of monopoly power in the relevant market" and "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966); see also Reazin, 899 F.2d at 973; Bright v. Moss Ambulance Serv., Inc., 824 F.2d 819, 823-24 (10th Cir.1987). In this circuit, we define monopoly power as the ability both to control prices and exclude competition. Bacchus, 939 F.2d at 894. The relevant market includes both product market and geographic market. "A product market includes those products which are reasonably interchangeable by consumers for the same purposes." Bacchus, 939 F.2d at 893; United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). We hold the relevant product market to be the sale and transportation of natural gas. The relevant geographic market is the area encompassing the plaintiff cities. Chanute I, 678 F.Supp. at 1532.
 
 
 36
 The Cities presented many affidavits concerning Williams' decision to close the pipeline. One expert testified the reasons Williams closed its pipeline were to control access to the pipeline, to maintain a large portion of its sales function and to increase its profit levels. One city clerk testified Williams' representatives told her Williams was not pleased with the existing contracts and wanted to enter new ones which Williams believed necessary to offer a permanent program with the same terms as the temporary program. Another economic expert found Williams
 
 
 37
 experienced a significant erosion in its sales volumes as [customers] converted to transportation. In other words, it was losing market share in the sales market as customers took advantage of open access[15] to contract with alternative suppliers. [Williams] acted to end open access in order to prevent this loss of market share, and in order to prop up the price that it received for its product.
 
 
 38
 Williams earned a higher margin on sales of gas than it did on transportation. The Cities assert Williams had one of the lowest take-or-pay liabilities among all the interstate pipelines in the country.
 
 
 39
 Williams moved for summary judgment arguing the record reflects it did not abuse its monopoly power. Williams does not dispute the basic facts the Cities offered. Williams' 1987 Annual Report to Shareholders states: "The company discontinued its interim open access program on August 1 to avoid incurring unacceptable take-or-pay deficiencies and loss of margins resulting from conversion of sales to lower margin transportation service." In the same report, Williams stated it expected to recoup most of its take-or-pay liability in early 1988. Williams' best estimates of its potential take-or-pay liability for the difference between closing the pipeline and leaving it open, at the time it made its decision, was $12.1 million.
 
 
 40
 The trial court granted Williams' summary judgment motion and found Williams' conduct was not anticompetitive, but rather the result of a legitimate business decision given the regulatory turmoil present in the natural gas industry. Chanute III, 743 F.Supp. at 1460-61. The Cities appeal asserting: (1) the trial court erred by finding regulatory turmoil immunized Williams' conduct; (2) the trial court applied the wrong legal standard to evaluate intent; and (3) genuine issues of material fact remain necessitating a trial on the merits.
 
 
 41
 Viewing the facts in the light most favorable to the Cities, we conclude the Cities have established the first part of the test--Williams has monopoly power in the relevant market. We next examine Williams' conduct to determine if closing the pipeline constituted willful maintenance of monopoly power. Intent determines whether the challenged conduct is fairly characterized as exclusionary or anticompetitive. Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 602, 105 S.Ct. 2847, 2857, 86 L.Ed.2d 467 (1985).[19] General intent is all that is necessary to establish a monopolization claim. Reazin, 899 F.2d at 973. "Section 2 is violated when monopoly power is gained or held by conduct constituting an abnormal response to market opportunities." Instructional Systems, 817 F.2d at 649. "In order to rise to a section 2 violation, however, the exclusionary conduct must appear reasonably capable of contributing significantly to creating or maintaining monopoly power." Id. Intending the natural consequences of acts that are lawful does not constitute the "exclusionary intent" required to find a § 2 violation. Pacific Eng. and Prod. Co. v. Kerr-McGee Corp., 551 F.2d 790, 795 (10th Cir.), cert. denied, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977). To determine whether conduct violates the antitrust laws we examine "its effect on competition, not its effect on an individual competitor." Bright, 824 F.2d at 824. "The Sherman Act 'does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.' " Colorado Interstate Gas Co. v. Natural Gas Pipeline Co., 885 F.2d 683, 697 (10th Cir.1989) (quoting Hunt v. Crumboch, 325 U.S. 821, 826, 65 S.Ct. 1545, 1547, 89 L.Ed. 1954 (1945)), cert. denied, --- U.S. ----, 111 S.Ct. 441, 112 L.Ed.2d 424 (1990).
 
 
 42
 A recent Seventh Circuit decision sheds light on the intent to monopolize analysis in the context of a natural gas pipeline dispute. Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co., 935 F.2d 1469 (7th Cir.1991). In Panhandle, the court found a monopolist pipeline's intent should be examined not as to
 
 
 43
 "whether the firm intended to achieve or maintain a monopoly, but as to whether the underlying purpose of the firm's conduct was to enable the firm to compete more effectively. Did the firm engage in the challenged conduct for a legitimate business reason? Or was the firm's conduct designed solely to insulate the firm from competitive pressure?"
 
 Id. at 1481. The court also said:
 
 44
 [T]he intent relevant to a § 2 Sherman Act claim is only the intent to maintain or achieve monopoly power by anticompetitive means. Section 2 forbids not the intentional pursuit of monopoly power but the employment of unjustifiable means to gain that power.... The offense of monopolization requires proof of "conduct designed to maintain or enhance [monopoly power] improperly."
 
 
 45
 Id. (quoting Olympia Equipment, 797 F.2d at 373).
 
 
 46
 In Panhandle, the pipeline had full requirements contracts in force with its customers. To enable it to supply the customers' needs on demand the pipeline entered into long term supply contracts. When Congress deregulated prices, other suppliers without long term supply contracts could offer gas at a less expensive price. The pipeline's customers wanted to get out of their existing contracts so they could buy cheaper third party gas to be transported over the pipeline. The issue presented to the court was whether the pipeline's efforts to keep its contracts in place by denying its customers the right to purchase third party gas violated the antitrust laws. Id. at 1480. The court found the pipeline's concern over take-or-pay liability coupled with the regulatory turmoil in the natural gas industry at the relevant time were sufficient to negate the possibility the pipeline's conduct was motivated by an anticompetitive intent. Id. at 1480-89.
 
 
 47
 We find a similar situation before us in this case. The Cities proffered expert affidavits attempting to establish Williams' rationale for closing the pipeline. Even by viewing these statements in the Cities' favor, we conclude the affidavits present arguments supporting a holding legitimate business concerns motivated Williams' conduct. The Cities argue Williams' low take-or-pay liability cannot be characterized as a legitimate business concern sufficient to justify closing the pipeline. Perhaps that argument would fly if that were the only evidence of concern, but evidence exists Williams also wanted to prevent conversion of sales service to transportation service. Consequently, we hold refusal to provide access can be justified by Williams' legitimate business concerns. Id. at 1485 (refusal justified where pipeline faced potential take-or-pay liability coupled with regulatory flux in the natural gas industry).
 
 
 48
 The undisputed evidence viewed in a light most favorable to the Cities shows Williams wanted to prevent take-or-pay liability, prevent conversion of sales services to transportation services, and enter into new contracts to enable it to offer a permanent program. The Cities provided no evidence to raise a factual dispute whether Williams had a legitimate business reason for closing the pipeline. The Cities' own evidence shows Williams told them it believed the new contracts were necessary to implement the permanent program and Williams earned more from selling gas than transporting it. Presented with these facts and recognizing the regulatory turmoil present in the natural gas industry, a reasonable juror could only conclude Williams had a legitimate business reason for closing the pipeline. When such a business reason exists, no misuse of monopoly power can be shown. See Aspen Skiing.
 
 
 49
 The Cities misunderstand the relevance of regulatory turmoil in this context. The turmoil does not immunize Williams from the antitrust laws. Rather, the existence of regulatory turmoil strengthens the conclusion that Williams' conduct was motivated by legitimate business concerns, not an anticompetitive motive.
 
 
 50
 The Cities rely on Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), for the proposition an asserted business justification must be procompetitive to withstand judicial scrutiny. In Otter Tail, an electricity producer's refusal to transport electricity over its lines (wheeling) to towns with which its contracts had ended violated § 2 of the Sherman Act. A similar argument was raised in Panhandle. Panhandle, 935 F.2d at 1485. However, the Panhandle court found the existence of extant contracts with its natural gas customers distinguished the cases. Similarly, as noted above, we found the full requirements provision of the contracts to be in full force when the pipeline was closed. Furthermore, the Federal Power Commission did not have the authority to force Otter Tail to wheel electricity over its lines. Otter Tail, 410 U.S. at 375-76, 93 S.Ct. at 1028. Williams, on the other hand, was subject to FERC regulation that required it to provide a permanent program of third party gas transportation, and Williams was in the process of complying with this regulation. Thus, we find Otter Tail is inapplicable to the facts of this case as some of the Cities had effective full requirements contracts with Williams and Williams was subject to regulations that required it to transport third party gas to the Cities.
 
 VI. EXTENDED PERIOD DAMAGES
 
 51
 The Cities claim they are entitled to consequential damages covering the period August 1988 through August 1993 as part of their claim for extended period damages for the time Williams closed the pipeline to the transportation of third party gas. They presented evidence tending to show that if Williams had not closed the pipeline, the city of Cleveland would have received an increased discount on its existing natural gas contract with a third party supplier.
 
 
 52
 Williams moved for summary judgment asserting Cleveland had an enforceable contract to receive third party gas and in fact had received gas pursuant to that contract executed in 1986. The court granted Williams' motion against Cleveland finding the Cities did not produce plausible evidence to dispute Williams' claim. Chanute II, 1990-1 Trade Cas. p 68,967 at 20. The Cities appeal and assert the court erred by denying extended period damages to Cleveland.
 
 
 53
 The record does not reflect Cleveland had begun any negotiations to receive an increased discount. The Cities' only evidence is an affidavit from Cleveland's supplier stating that if he entered into contracts with the other cities he would have increased Cleveland's discount to make them all comparable. Summary judgment is proper when the opposing party provides nothing more than speculation or suspicion. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir.1988).
 
 VII. SEVENTH AMENDMENT CLAIM
 
 54
 The Cities assert that granting summary judgment on issues which involve a determination of reasonableness violates their Seventh Amendment right to a jury trial. The Supreme Court has found that summary judgment, applied properly, does not violate the Seventh Amendment. Fidelity & Deposit Co. v. United States ex rel. Smoot, 187 U.S. 315, 319-21, 23 S.Ct. 120, 121-22, 47 L.Ed. 194 (1902). The Supreme Court has also said:
 
 
 55
 While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.
 
 
 56
 First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). The trial judge in this case applied the law to undisputed fact. We find this case is a proper one for summary judgment. Accordingly, the Cities' Seventh Amendment right was not violated.
 
 VIII. TRANSITORY NATURE OF WILLIAMS' CONDUCT
 
 57
 In granting Williams' motion for summary judgment, the district court found Williams' conduct too transitory to support a claim for treble damages under the Clayton Act because the Cities extant contractual obligations were due to expire and the permanent program was implemented in July 1988. Chanute II, 1990-1 Trade Cas. p 68,967 at 13. In further support of granting summary judgment as to Cities' remaining § 2 claims, the court reiterated its factual findings. Chanute III, 743 F.Supp. at 1460. The Cities argue the court's conclusion is clearly erroneous and therefore summary judgment should be reversed. We need not reach the question of whether Williams' actions were transitory because we have disposed of all the Cities' claims on summary judgment on other grounds. The district court's conclusion Williams' conduct was transitory was only an alternative ground to his grant of summary judgment on other dispositive issues. He had already granted summary judgment and bolstered his decision by adding he found Williams' conduct transitory. We need not reach those alternative grounds on appeal.
 
 IX. ATTORNEYS' FEES
 
 58
 The Cities moved for an extension of time to apply for attorneys' fees and costs pursuant to § 16 of the Clayton Act, which provides attorneys' fees for a plaintiff who substantially prevails in any action under this section. 15 U.S.C. § 26 (1988). The Cities theorize they "substantially prevailed" on their motion for preliminary injunction and thus are entitled to attorneys' fees. The district court granted the Cities' motion for preliminary injunction in Chanute I. This court stayed the injunction pending appeal and vacated the stay when the parties entered into a stipulation providing for the transportation of third party gas over Williams' pipeline. The Cities assert the terms of the stipulation are similar to relief requested in its preliminary injunction motion.
 
 
 59
 Williams counters the terms in the stipulation were not pursuant to the Cities' threatened litigation, but instead were suggested by separate FERC administrative proceedings.
 
 
 60
 The district court entered three orders in the matter. In its first Order, the court denied the Cities' motion for an extension of time to file for application of fees and costs. The court stated it was divested of jurisdiction because of the pending appeal on the merits of the case but would consider a motion for fees if we remanded the case and the Cities prevailed. The Cities moved for a fee award nonetheless. In its second order, responding to the Cities' fee application, the district court again stayed determination of fees awaiting our decision in this matter. Finally, in its third Order, the court stated it was "not inclined to award attorney fees and costs to any litigant for simply prevailing at the time of hearing on injunctive relief." The court reiterated it would entertain attorneys' fees motions at the conclusion of the appeal. The Cities assert as error: (1) the court should have awarded attorneys' fees under § 16; (2) their fee application was timely; and (3) the court retained jurisdiction to determine a fee award.
 
 
 61
 Whether the district court retained jurisdiction over the award of attorneys' fees is a question of subject matter jurisdiction subject to de novo review on appeal. See Thomas Brooks Chartered v. Burnett, 920 F.2d 634, 641 (10th Cir.1990). The law is well settled the district judge retains jurisdiction over the issue of attorneys' fees even though an appeal on the merits of the case is pending. Stewart v. Donges, 915 F.2d 572, 575 n. 3 (10th Cir.1990); Garcia v. Burlington Northern R. Co., 818 F.2d 713, 721 (10th Cir.1987); Cox v. Flood, 683 F.2d 330, 331 (10th Cir.1982). Indeed, the trial court cannot make a determination of attorneys' fees until one party has prevailed. Cox, 683 F.2d at 331. Thus, the trial court retains jurisdiction to award attorneys' fees even though we have rendered our judgment in the case.
 
 
 62
 In its first motion, the court exercised jurisdiction by denying the Cities' motion for an extension of time to apply for costs. The court stated the Cities should have raised the issue earlier. The Cities filed an application for fees anyway, which the court received. The trial judge did not dismiss the application as untimely but rather stayed a determination of any fees until this court renders a decision on the merits of the case. The Cities' second claim of error is therefore moot.
 
 
 63
 We do not have jurisdiction to address the propriety of the Cities' first assertion. Only final decisions of the district court are appealable. 28 U.S.C. § 1291 (1988); Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 874 F.2d 1346, 1351 (10th Cir.1989). The district court's decision to stay determination of an award of attorneys' fees is not a final appealable order. Consequently, we must dismiss the Cities' appeal for lack of jurisdiction.
 
 
 64
 All orders of the trial court granting summary judgment are AFFIRMED and the Cities' appeal concerning attorneys' fees is DISMISSED.
 
 
 65
 SEYMOUR, Circuit Judge, concurring.
 
 
 66
 I, too, would affirm the judgment of the court below. I agree fully with parts I, II, V, VI, VII, VIII, and IX of the majority's opinion. I agree with the majority's conclusion in part III, although I would reach it for substantially different reasons as set out below. Finally, I agree with the portions of part IV that hold that Williams did not violate the antitrust laws. I would not reach the question of antitrust standing in this case. Because of the importance of the questions raised by this appeal, I feel compelled to write separately.
 
 
 67
 In part III, the majority relies on McKenzie v. Mercy Hospital, 854 F.2d 365 (10th Cir.1988), to support its position that "a tying arrangement imposed by a single entity is not proscribed by § 1 of the Sherman Act." Majority opinion at page 650. This reliance is misplaced. Not only is McKenzie factually distinguishable,[1] and therefore not controlling, but under the law of this and other circuits, a buyer who alleges that he has been coerced or forced by a seller into an illegal tying arrangement has stated the requisite combination or conspiracy under section 1 of the Sherman Act. Here, the Cities allege that such forcing occurred and it is only because they have not stated facts from which the trier of fact could find forcing that summary judgment on this issue is appropriate.
 
 
 68
 The possibility of establishing a tying claim through forcing is well established in the case law. In Black Gold, Ltd. v. Rockwool Indus., Inc., 729 F.2d 676, 686 (10th Cir.1984) (emphasis added), we stated:
 
 
 69
 "Subsequent to [United States v.] Parke, Davis, [and Company, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) ], the Supreme Court made it clear that a plaintiff who contends a seller has unlawfully used a refusal to deal as a means of enforcing an anticompetitive practice (such as tying or price-fixing) may establish the requisite combination or conspiracy in either of two ways: by showing that he himself unwillingly complied with the practice, or by showing that although he refused to acquiesce, other buyers agreed to the arrangement under threat of termination. See Perma Life Mufflers v. International Parts Corp., 392 U.S. 134, 142, 88 S.Ct. 1981, 1986, 20 L.Ed.2d 982 (1968); Albrecht v. Herald Co., 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 872 n. 6, 19 L.Ed.2d 998 (1968). See also, Yentsch v. Texaco, Inc., 630 F.2d 46, 51-52 (2d Cir.1980); Arnott v. American Oil Co., 609 F.2d 873, 885 (8th Cir.1979), cert. denied, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980)."
 
 
 70
 We affirmed our holding on rehearing, where the defendant urged us to reconsider our conclusion that the record contained evidence of a tying conspiracy. We stated that "we do not construe Monsanto [Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) ] as a retreat from those cases holding that a combination occurs between a seller and buyers 'whose acquiescence in [the seller's] firmly enforced restraints was induced by "the communicated danger of termination." ' " Black Gold, Ltd. v. Rockwool Indus., Inc., 732 F.2d 779, 780 (10th Cir.), cert. denied, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 113 (1984); see also Smith Mach. Co., 878 F.2d at 1294-95; Image Tech. Serv., Inc. v. Eastman Kodak Co., 903 F.2d 612, 619 (9th Cir.1990), cert. granted, --- U.S. ----, 111 S.Ct. 2823, 115 L.Ed.2d 994 (1991); Will v. Comprehensive Accounting Corp., 776 F.2d 665, 669-70 (7th Cir.1985), cert. denied, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986).
 
 
 71
 Here, the Cities allege that Williams illegally tied the purchase of natural gas to its transportation and that they were forced into accepting the arrangement because they had no alternative source. As the majority notes at page 649, Williams's gas was sold at FERC approved prices, and the Cities could have obtained cheaper third party gas throughout this period. For the same reasons Williams did not have an essential facility, it could not have forced the Cities to acquiesce. As a consequence, summary judgment on the tying claim was appropriate.
 
 
 72
 In part IV, the majority considers various other claimed violations raised by the Cities on appeal. To the extent that the section holds that there is no violation of the Sherman Act, I agree. As a consequence of holding that the antitrust laws were not violated, however, I would not reach the questions of antitrust standing and antitrust injury. Each of these related doctrines concerns the relation between the antitrust violation at issue and the injury suffered by the plaintiffs. See Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (direct purchaser limitation--standing is a question of remoteness); Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (antitrust injury limitation--injury must be the kind the antitrust laws were intended to prevent).
 
 
 73
 The majority's discussion of Central Nat'l Bank v. Rainbolt, 720 F.2d 1183, 1187 (10th Cir.1983), and Axis, S.p.A. v. Micafil, Inc., 870 F.2d 1105, 1108-09 (6th Cir.), cert. denied, 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989), illustrates this problem. See maj. op. at 652-653. The focus in antitrust standing and injury cases is on the relationship between the antitrust violation and the injury asserted by the plaintiff. The first paragraph on page 653 of the majority's opinion makes precisely this point. The analysis that follows does not, however, apply this principle. Rather, it holds that Williams did not violate the antitrust laws. Id. at 653. The question of the relationship between the asserted antitrust violations and alleged injury, the heart of the standing and antitrust injury cases, is not discussed by the majority. This is for a good reason; absent a violation there is no relationship to consider. As a result, the majority's conclusion that "the Cities have not established the first prong of the antitrust standing test--an antitrust injury," id. at 653, bears little relation to the analysis that it follows. The issues involved in a standing inquiry, nicely summarized in footnote 14 of the opinion, simply do not connect to the text's discussion of the Cities' antitrust claim.
 
 
 74
 The conclusion of section IV suggests that the Cities' claims fail under Brunswick, but the opinion draws on Olympia Equip. Leasing Co. v. Western Union Tel. Co., 797 F.2d 370, 376 (7th Cir.1986), cert. denied, 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987), for its substantive holding. Olympia does not discuss antitrust standing at all; I am convinced that we should have followed suit. The majority could only justify its discussion had it assumed a violation of the antitrust laws and then considered the nature of the injury and the proximity between these plaintiffs and the violation.
 
 
 75
 Under those circumstances, it would have been impossible to hold that these plaintiffs either lacked antitrust standing or did not suffer antitrust injury. The Cities were direct purchasers, not barred by Illinois Brick. That doctrine would bar a suit initiated by customers of the City of Chanute, but has nothing to say about the legitimacy of this suit. Likewise, the doctrine articulated in Brunswick would not bar this suit; the type of injury alleged by the Cities is precisely the type of injury the antitrust laws were designed to prevent. The problem with Cities' suit is that Williams did not violate the antitrust laws. Absent a violation, there can be no recovery under the Clayton Act. I would say no more than that.
 
 
 76
 The Cities alleged that Williams violated the antitrust laws. Such allegations are insufficient to withstand summary judgment if there are no facts that could support a finding of a violation. See Matsushita Elec. Indus. v. Zenith Radio, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). There are no such facts here. As a consequence, I vote to affirm the decision of the district court.
 
 
 
 [1]
 A complete history of this case, as well as a history of the natural gas industry is set forth in more detail in City of Chanute v. Williams Natural Gas Co., 678 F.Supp. 1517 (D.Kan.1988) ("Chanute I "); City of Chanute v. Williams Natural Gas Co., 1990-1 Trade Cas. p 68,967, 1990 WL 20019 (D.Kan. Feb. 16, 1990) ("Chanute II "); and City of Chanute v. Williams Natural Gas Co., 743 F.Supp. 1437 (D.Kan.1990) ("Chanute III ")
 
 
 [2]
 Williams sought a transportation tariff pursuant to Order No. 436, 50 Fed.Reg. 42,408 (1985), issued by the Federal Energy Regulatory Commission ("FERC"). FERC is the regulatory agency that governs the natural gas industry
 
 
 [3]
 Williams initiated this interim open-access program pursuant to § 311 of the Natural Gas Policy Act, 15 U.S.C. § 3371 (1978)
 
 
 [4]
 Williams had take-or-pay provisions in its contracts with natural gas suppliers. A take-or-pay provision obligates a pipeline to pay for certain volumes of gas even if the pipeline is unable to sell that amount to its customers
 
 
 [5]
 Williams was still required to transport third party gas pursuant to FERC's Order No. 451 which "established procedures for the renegotiation of low, old, Pre-NGPA gas prices and the release of gas covered by such pre-NGPA gas purchase contracts." Chanute I, 678 F.Supp. at 1524-5
 
 
 [6]
 Interruptible service does not guarantee that a producer will have sufficient supplies of natural gas to meet all consumers' demands
 
 
 [7]
 Firm service does guarantee that consumers' demands will be met
 
 
 [8]
 The Cities also assert that Order 451, which authorized the approved third party suppliers, has been declared unlawful and should not be considered. The district court found this argument specious. Chanute II, 1990-1 Trade Cas. p 68,967 at 18. We agree. This argument merits no discussion
 
 
 [9]
 But Williams does not have to share its pipeline "if such sharing would be impractical or would inhibit the defendant's ability to serve its customers adequately." Hecht v. Pro-Football Inc., 570 F.2d 982, 992-93 (D.C.Cir.1977), cert. denied, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978)
 
 
 [10]
 In United States v. Loew's Inc., 371 U.S. 38, 40, 83 S.Ct. 97, 99, 9 L.Ed.2d 11 (1962), the Court allowed a claim under § 1 where "[n]o combination or conspiracy among [defendants] was alleged." Whether a plaintiff must first show the existence of an agreement or conspiracy was not presented to the Supreme Court in this case and was not part of its holding
 
 
 [11]
 The Cities claims of error regarding "forcing" of a tying arrangement are necessarily rendered moot
 
 
 [12]
 At one time each of the Cities had full requirements contracts with Williams. Through periodic renewals, the contracts for three cities were to continue in effect until July 22, 1988. Contracts for three other cities were to continue in effect until April 22, 1988
 
 
 [13]
 The cities whose contracts expired after permanent open access began were denied any standing. The cities whose contracts expired in April were found to have standing from the time the contract expired until the permanent open access began. Chanute II, 1990-1 Trade Cas. p 68,967 at 16-17
 
 
 [14]
 Standing and antitrust injury are essential elements in § 4 Clayton Act damage actions. Reazin, 899 F.2d at 960. Recent Supreme Court cases closely link standing to a showing of antitrust injury. Id. at 961. An antitrust injury is different from antitrust standing. Axis, S.p.A. v. Micafil, Inc., 870 F.2d 1105, 1108-09 (6th Cir.1989). Standing cannot be established without an antitrust injury, but the existence of an antitrust injury does not automatically confer standing. Id. The following factors should be considered when evaluating antitrust standing: (1) the causal connection between the alleged antitrust violation and the harm; (2) improper motive or intent of defendants; (3) whether the claimed injury is one sought to be redressed by antitrust damages; (4) the directness between the injury and the market restraint resulting from the alleged violation; (5) the speculative nature of the damages claimed; and (6) the risk of duplicative recoveries or complex damage apportionment. Reazin, 899 F.2d at 962 n. 15
 
 
 [15]
 Proximate cause can be shown by the following: (a) causal connection between the antitrust violation and an injury sufficient to establish the violation as a substantial factor in the occurrence of damages, and (b) the illegal act linked to plaintiff engaged in activities intended to be protected by antitrust laws. Facet, 774 F.2d at 389
 
 
 [16]
 The program was initiated pursuant to § 311 of the Natural Gas Policy Act. 15 U.S.C. § 3371. This section authorized FERC to permit open access but did not authorize FERC to order the pipelines to do so. Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co., 935 F.2d 1469 (7th Cir.1991)
 
 
 [17]
 Northwest Central is Williams predecessor and is considered the same entity for purposes of this discussion
 
 
 [18]
 Open access refers to the transport of third party gas over Williams pipeline as it was during the temporary program and ultimately under the permanent plan
 
 
 [19]
 The Cities ask us to apply a procompetitive standard to establish legitimate business decisions. This is not the law. See Olympia Equipment, 797 F.2d at 375-76
 
 
 [1]
 McKenzie is distinguishable because in that case the plaintiff himself did not and could not agree to the illegal arrangement, nor did he allege that anyone else had done so. Compare Smith Mach. Co. v. Hesston Corp., 878 F.2d 1290, 1294 (10th Cir.1989), cert. denied, 493 U.S. 1073, 110 S.Ct. 1119, 107 L.Ed.2d 1026 (1990) (plaintiff refused to accede to defendant's forcing; court analyzed merits under theory that defendant induced plaintiff's competitors to accede)