**CITY OF COLLEGE STATION, TEXAS, Plaintiff,**

**v.**

**CITY OF BRYAN, TEXAS, Texas Municipal Power Agency, Texas Municipal Power Pool, Inc., Brazos Electric Power Cooperative, Inc., Michael Conduff, Gailord White, and Dan Wilkerson, Defendants.**

**Civil Action No. H–95–5627.**

United States District Court, S.D. Texas, Houston Division.

Jan. 10, 1996.

John C. Eichman, T. Richard Handler, Jenkens & Gilchrist, Dallas, TX, for City of College Station, Texas.

Lin Hughes, McGinnis Lochridge & Kilgore, Austin, TX, for The City of Bryan Texas, Michael Conduff, Dan Wilkerson.

Tom Alan Cunningham, Fulbright & Jaworski, Houston, TX, for Texas Municipal Power Agency, Gailord White.

Richard L. Adams, Robert P. Oliver, Worsham Forsythe & Wooldridge, Dallas, TX, for Texas Utilities Elect.

## AMENDED MEMORANDUM AND ORDER DENYING PRELIMINARY INJUNCTION

ATLAS, District Judge.

### INTRODUCTION

This case involves the sale and transmission of wholesale electric power and energy in the College Station, Brazos County, Texas service area. Plaintiff, the City of College Station, Texas ("College Station" or "Plaintiff"), has applied to this Court for preliminary and permanent injunctive relief. College Station alleges that Defendants City of Bryan, Texas ("Bryan") and the Texas Municipal Power Agency ("TMPA")[1] constructively have denied College Station access to these Defendants' electric power transmission lines, which are the only lines over which College Station currently can receive electric power from its new electric energy supplier. College Station contends that Bryan and TMPA, by refusing to "wheel," or transfer, across their transmission lines are violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and Section 16 of the Clayton Act, 15 U.S.C. § 26.

College Station filed its complaint on December 14, 1995, and immediately sought a setting on its prayer for preliminary injunctive relief, which College Station insisted needed to be issued before midnight on December 31, 1995. The Court set the matter for argument and hearing on December 15, 1995.

The Court overruled Defendants' various objections to proceeding and heard testimony for two full days, December 15 and December 19. Final oral argument was held on December 20, 1995. The parties, while under severe time pressures dictated by the circumstances, all cooperated with the Court and each other in exchanging documents, submitting legal authorities to the Court,[2] and introducing evidence.[3]

---

**1.** The other Defendants are the Brazos Electric Power Cooperative ("Brazos," a private Texas corporation that manages the TMPA power control area), the Texas Municipal Power Pool ("TMPP," a private Texas corporation organized by the Cities of Bryan, Garland, Denton and Greenville, Texas and Brazos, to interconnect the power systems of its members, among other things), Michael Conduff ("Conduff," the City Manager of Bryan and the Chairman of TMPP), Gailord White ("White," the TMPA manager of system planning) and Dan Wilkerson ("Wilkerson," Bryan's Director of Electric Utility Services). Plaintiff's Complaint makes no allegations of misconduct by these Defendants, and it stated that they are named in this action as necessary parties to implement any relief the Court should grant. See Complaint ¶¶ 6–12, 24; Fed.R.Civ.P. 19.

**2.** College Station has filed a Brief Regarding Inapplicability of State Action Doctrine [Doc. # 18]. The brief was faxed to chambers on December 27, 1995, one day after this Court issued the opinion denying preliminary injunctive relief. The Court has reviewed the brief and is satisfied that this amended opinion satisfactorily addresses the arguments it presents.

**3.** The Court heard testimony proffered by College Station from Robert Pohl, the Electric Division Manager of College Station, Samuel C. Hadaway, an expert on energy regulatory matters, Gailord White (see n. 1), and Bryan's City Manager Conduff, who also serves as Chairman of TMPP. The Court received in evidence the affidavits of Linda Piwonka, Executive Director for Management Services for College Station, on the history of dealings between Bryan and College Station on energy matters, and Whitfield A. Russell, proffered as an expert on electric production and transmission planning, on the essential nature of Defendant Bryan and TMPA's transmission facilities to College Station, the workings of the Electric Reliability Council of Texas ("ERCOT"), and wheeling practices within it. Defendants objected to the admission of these affidavits but when invited to cross-examine the affiants who were present in court on December 19 or 20, or to submit counter-affidavits, they did not do so. Defendants called William B. Townsend, Jr., a representative of TMPP, to testify concerning the mechanics of TMPP's implementation of a change of power supply for College Station from TMPA to TU. The Court rejected Defendants' proffer of an affidavit from one of the defense counsel in this

■ The Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 to reach the questions now before it.[4]

Plaintiff requests that the Court issue a broad, multi-part injunction (1) that essentially prohibits Defendants from interfering in any way with the flow of electric power from TU's electric power generating plant to College Station, (2) that prohibits Defendants from "engaging in any and all acts, omissions and/or other conduct that in any way deprives, is intended to deprive, or attempts to deprive College Station of access to electric power and energy from TU commencing on or after midnight on December 31, 1995," (3) that prescribes a wheeling rate to govern the parties' relationship until an appropriate regulatory agency hears and determines the rate issue, and/or the PUCT issues new binding regulations that govern the permissible wheeling rates, and/or (4) that sets a bond in an amount sufficient to protect the Defendants in the event the Court-imposed rate is found by the regulators to be too low.

College Station's request for a preliminary injunction is denied. The Court concludes that College Station cannot meet the requirements for the extraordinary relief it seeks because it cannot establish that it has a substantial likelihood of success on the merits of the claims it asserts. The Court also questions the legal viability of the claimed irreparable harm and whether the public interest is served by a federal court granting injunctive relief in what is essentially an aborted contract negotiation between public entities engaging in state-authorized commercial activities.

## FACTUAL BACKGROUND

Defendants TMPA and Bryan own and control the only transmission facilities currently capable of "wheeling" electric power to College Station. Bryan and TMPA also own and operate electric power and generating plants. College Station does not. From January 1, 1992 to date, College Station has purchased (and continued to purchase through December 31, 1995) power and energy from TMPA, and occasionally supplemental power from one or more TMPA cities, such as Bryan, pursuant to an Agreement for Wholesale Electric Service ("TMPA Agreement"), entered into effective January 1, 1990. Under the TMPA Agreement, Defendants TMPA and Bryan have supplied College Station with uninterrupted power *and* transmission services, and TMPP has assisted in the implementation of this contract.

In 1994, College Station realized that its contract might be causing its residents to pay above-market prices for power and energy. Plaintiff's Exhibit # 25 (Affidavit of Linda Piwonka) (hereinafter "Piwonka Affidavit"), at 1–2. Seeking to reduce its citizens' electricity costs, College Station issued a request for bids in the fourth quarter of 1994 seeking proposals from potential suppliers of wholesale electric power and energy, for a contract to commence at the expiration of the TMPA Agreement, January 1, 1996.

matter, which was offered as an expert's view of work currently being undertaken by the Public Utility Commission of Texas on potential revisions to the methods for setting wheeling rates. The affidavit would have been cumulative.

4. Defendants initially argued that the primary jurisdiction doctrine deprived this Court of authority to adjudicate any of these parties' disputes, since the Federal Energy Regulatory Commission ("FERC") or the Public Utility Commission of Texas ("PUCT"), and not a court, is the proper body to set transmission rates. However, at the injunction hearing on December 19, 1995, Defendants conceded that the Court has subject matter jurisdiction over this action. They nevertheless continue to argue that fundamentally this dispute should be handled by expert administrative agencies. Primary jurisdiction is "a flexible doctrine to be applied at the discretion of the district court." *Wagner &*

*Brown v. ANR Pipeline Co.*, 837 F.2d 199, 201 (5th Cir.1988). At this preliminary injunction hearing stage of the case, the primary jurisdiction doctrine is not a bar to this Court's jurisdiction. *See, e.g., Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *City of Chanute v. Kansas Gas and Electric Co.*, 564 F.Supp. 1416, 1423 (D.Kan. 1983), *rev'd in part on other grounds and aff'd in pertinent part*, 754 F.2d 310 (10th Cir.1985). However, in light of the Court's rulings below, it is unclear what relief College Station continues to seek other than the imposition by the Court of a "fair" price pending an administrative determination of the rate issues. To the extent price is the chief remaining issue, the Court's continued involvement is questionable. *See Gulf States Utilities Co. v. Alabama Power Co.*, 824 F.2d 1465, 1469–71 (5th Cir.1987). *See infra*, at 23.

Seventeen bids were submitted, including bids from TMPA and Bryan. On September 14, 1995, after negotiations with several bidders and protracted negotiations with Bryan, *see id.* at 3, College Station entered into a wholesale energy and power supply contract with Texas Electric Utilities Company ("TU"), which is not a party to this action. That contract provides that TU will begin supplying power to College Station immediately after expiration of the current contract at midnight on December 31, 1995.

In order for the TU–College Station contract to be implemented, TU needs to deliver the electric power to College Station through transmission lines owned by others. Plaintiff's Exhibit #26 (Affidavit of Whitfield A. Russell) (hereinafter "Russell Affidavit"), ¶ 7; Piwonka Aff., at 3. College Station needs transmission, or "wheeling," services and typically there is a written contract between the energy supplier (here, TU) and the owners of the transmission lines (here, TMPA and Bryan) to establish the terms under which the power will be delivered. *See, e.g.,* Russell Aff., ¶¶ 9, 10; Plaintiff's Exhibits 13, 17; Defendants' Exhibit 1 (Transcript of December 11, 1995 meeting among parties). TMPP in the ordinary course would enter into a Remote Control Area Load Agreement ("RCAL Agreement") to implement the transmission services on behalf of the other parties, although it appears that a written agreement may not be absolutely necessary. Russell Aff., ¶¶ 9, 10; Townsend Testimony.[5]

The dispute in this case centers on this service and College Station's negotiations with Bryan and TMPA on a transmission service (wheeling) agreement. To date there is no such contract.

College Station has argued for the relief it seeks based largely on the circumstances that existed before the hearings on its motion for preliminary injunctive relief. At that time, TMPA and Bryan took the position that they would not wheel the TU power to College Station without a formal agreement.

*See* Plaintiff's Exhibits 13, 15, 17; Defendants' Exhibit 1. Since the filing of the lawsuit and commencement of the hearing, however, the circumstances have changed to some degree. Subsequent to the close of the hearing, for instance, the RCAL Agreement negotiated by College Station and TU has been signed by TMPP and the other necessary Defendant parties.[6]

Before this lawsuit was filed, the parties engaged in what can only be described as stilted negotiations in an attempt to reach an agreement. These negotiations were never more than posturing by the parties to assert their starting positions. The wheeling price and length of the contract, as well as details about the parties' positions to be taken before regulatory agencies, are still in dispute. The Court summarizes below the history and contentions of the parties to provide context for the rulings that follow.

The parties previously had a wholesale electric service contract governing the combined services of power generation and transmission from the Defendants' generating facilities, as needed, to College Station. The evidence indicates that neither College Station, nor TMPA, nor Bryan previously had negotiated very large contracts governing wheeling services only. The witnesses' testimony indicates that both sides lacked accurate historical cost data on which to base or anticipate the rates Defendants would seek to charge for the "unbundled" transmission contract. Pohl Testimony; White Testimony. *See also* Hadaway Testimony.

College Station complains that Defendants in reality are seeking to eliminate the financial benefits of the TU contract through high wheeling charges, and thus make TMPA's or Bryan's bids to supply the power more attractive. College Station specifically alleges that

Defendants have refused to make their transmission lines and facilities available to College Station on fair, reasonable, non-

5. The transcript of the preliminary injunction hearing has not yet been made available to the Court. Therefore, no page references are possible and citations in this memorandum to the testimony are necessarily from notes by the Court.

6. It is therefore unclear what relief, if any, College Station now seeks against TMPP and its agents.

discriminatory terms, and thereby have denied College Station access to and use of such transmission lines and facilities by, among other things, negotiating in bad faith to delay access, pricing same significantly above comparable competitive market rates and charges, and imposing unreasonable terms and conditions, including without limitation denial of the right to challenge such rates, charges, terms and conditions before the appropriate regulatory authorities.

Complaint, ¶ 42(c). College Station contends that Defendants' proposed transmission contracts provide for rates exceeding the rates Defendants charge themselves for use of their own systems, and contains unfounded terms and conditions that constitute an unreasonable restraint of trade. Aside from the proposed wheeling price, College Station argues that Defendants' unreasonable terms include the requirement that the wheeling contract last as long as the TU contract and that College Station waive any right to challenge the agreed wheeling charges before the applicable government agencies (either the PUCT or the FERC). College Station also argued that Defendants' requirement that Bryan and TMPA each have a separate wheeling contract was unfair because each entity was not only seeking to impose an excessive charge, but the charges constituted "pancaking" because they were duplicative. *See* Hadaway Testimony.

As to the wheeling rates, College Station adduced evidence that PUCT and other information publicly available suggests that typically transmission facility owners' costs are computed on the basis of embedded construction and operating costs incurred by the owners, as Defendants Bryan and TMPA purport to do here. However, Plaintiff's evidence indicates that typically these costs are well below Defendant TMPA's and Bryan's proffered numbers. (*See* footnote 13, *infra.*) As to Bryan and TMPA's "pancaking", College Station's witnesses acknowledged that this practice was well known and not unlawful under existing PUCT and FERC regulations and practices. *See e.g.,* Hadaway Testimony.

College Station's expert, Mr. Hadaway, however, while apparently learned in PUCT practices, could not comment definitively on errors in Defendants' figures because he lacked detailed knowledge of the factual basis for these calculations. This is understandable, due to lack of meaningful access to the underlying data and the individuals who did the calculations, but his testimony made it clear that the Court is not the proper forum for the analysis, which requires substantial expertise, analysis by numerous experts, and significant time.

College Station argued in response that the PUCT was considering implementing an entirely new regulatory system that would result in all customers paying the same wheeling charge throughout the State of Texas, known as a "postage stamp rate." *See* 20 Tex.Reg. 9520–9527 (Nov. 17, 1995), proposing amendments to the PUCT Substantive Rules, § 23.66(d), the repeal of existing § 23.67, and the creation of a new § 23.67. The testimony is uncontroverted that the PUCT has published for comment a set of proposed regulations to achieve that purpose. *Id.* There seems to be significant debate in the electric utility industry about how the proposed system would work, how the charges would be calculated as to each facility owner, how the owners' compensation would be handled and when the new rate system, if it ever is adopted by the PUCT, would take effect. It is also unknown whether the "postage-stamp rate" would be retroactive or would allow existing wheeling contracts to remain in force, *i.e.,* to be "grandfathered." *See generally,* Hadaway Testimony; argument of counsel (Lambeth Townsend, E. Campbell McGinnis, and M.D. Sampels). The desire to benefit from the anticipated "postage-stamp rate" appears to be the primary motivation for College Station's resistance to negotiating a fixed term wheeling contract.

On the merits of College Station's complaints, Defendants argue that College Station is entirely at fault for the failed negotiations. They claim that College Station was late in commencing the negotiations, *see*

Plaintiff's Exhibit 13,[7] that it relied on data without informing Defendants of its intention to do so, that College Station did not seek to "lock in" any wheeling rate when it initially requested cost estimates in the summer of 1995 (while Bryan was still negotiating for the supply contract against TU), and that in December, after Defendants' proposals were delivered, College Station refused to make any counter-offer or otherwise negotiate specific terms. *See, e.g.,* Defendants' Exhibit 1. Defendants contend that College Station merely sought to build a record for this lawsuit by "cross-examining" Defendants' representatives at the only face to face meeting between the parties after Defendant learned that the TU contract was definite, and by having a secretary record and transcribe all that was said. *See id.* Defendants contend that College Station adopted this negotiating strategy because of the "postage-stamp rate" wheeling charge regulatory changes expected in mid–1996, which may be favorable to College Station's long-term interests.

Defendants further argue that the rate is the only genuine dispute between the parties, and that this Court is not the appropriate forum for rate-setting. Defendants point to the testimony of College Station's witnesses to establish that their method of setting their rates is currently permissible and, indeed, the established method (*i.e.,* to calculate embedded costs as suggested by PUCT Substantive Rule § 23.66(d)(5) and permitting pancaking. Defendants' Exhibit # 4 (PUCT Substantive Rules), § 23.66(d)(5)(B); *see also id.,* § 23.66(b)(2), § 23.67(c). Finally, they argue that their proposed rates are a justified exercise of their rate setting authority, and if College Station is dissatisfied, it could have filed a proceeding earlier with the PUCT or FERC. *See* Tex.Rev.Civ.Stat. Ann. art. 1435a–4a(g); *see generally* Public Utility Regulatory Act of 1995, Tex.Rev.Civ. Stat.Ann. art. 1446c–0 (Vernon Supp.1996) ("PURA").

Independent of the foregoing, Defendants argue that they are immune from any anti-trust claims asserted under the Clayton Act, since the state action doctrine enunciated by the United States Supreme Court in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), applies. They argue as to the tortious interference claim that they have done nothing to interfere with the TU contract and that their negotiating positions and other conduct are well within the exercise of their legitimate rights as transmission line owners.

The testimony of record, exhibits received in evidence, and arguments of counsel reveal that the negotiations, which continued throughout the hearing, in part on the record, have occurred in a complex factual setting that includes other litigation between some of the parties (the cities of College Station and Bryan, *see* Piwonka Aff., at 1–2), public bodies' splintered decision making, a changing regulatory environment, and inexperience, naivete or simply mistakes by the principals in some of the calculations necessary to the parties' respective positions.

The Court expressly declines to find that any party has acted in bad faith. Both sides in these negotiations have been jockeying for position and seeking leverage that will enable them to attain a transmission agreement that best serves their constituents' interests. This is understandable under the circumstances and does not warrant Court intervention.

Plaintiff College Station comes to the Court seeking relief from what it labels anti-trust violations by Defendants and tortious interference with College Station's contract with TU. College Station seeks a preliminary injunction ordering Defendants (1) not to interfere with TU's supplying College Station with electricity, (2) to wheel the power without interruption, and (3) to accept as compensation a sum to be set by the Court—until an appropriate regulatory agency determines an appropriate rate.

Defendants vehemently oppose any injunction or, for that matter, any court involvement whatsoever.

---

**7.** The timing may well have been a function of Bryan's continuing interest in being considered as the supplier of the energy. *See* Piwonka Aff., at 2–3. Nevertheless, College Station may have been operating on an unrealistic schedule.

### Preliminary Injunction Standard

■ In order for a court to grant preliminary injunctive relief, College Station must establish the existence of the following four requirements:

(1) a substantial likelihood that a plaintiff will prevail on the merits;

(2) a substantial threat that irreparable injury will result if the injunction is not granted;

(3) that the threatened injury outweighs the threatened harm to the defendants; and,

(4) that granting the preliminary injunction will not disserve the public interest.

*Rodriguez v. U.S.*, 66 F.3d 95, 97 (5th Cir. 1995); *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974).

■ College Station has the burden of proving each element. Furthermore, it goes without saying that, in determining whether the requirements for an injunction have been met, this Court must look to the facts in existence at the time that the injunction issues, and not the situation as it existed several weeks ago or, as some may speculate, as the facts may exist in the future.

### Substantial Likelihood of Success on the Merits

In order to warrant the issuance of a preliminary injunction, College Station must establish first that there is a substantial likelihood that it will prevail on the merits of its substantive claims.

### 1. Sherman Act

*The Basic Claims.*—College Station has asserted claims under Sections 1 and 2 of the Sherman Act. Section 1 prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. In order for there to be a violation of Section 1 of the Sherman Act, two or more persons must act in concert to restrain trade. The Supreme Court has stated that a plaintiff must establish that defendants have a common scheme to achieve an illegal goal. *Monsanto Co. v.*

*Spray–Rite Service Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 1472–73, 79 L.Ed.2d 775 (1984) ("there must be direct or circumstantial evidence that reasonably tends to prove that the [conspirators] had a conscious commitment to a common scheme designed to achieve an unlawful objective"). College Station argues that Defendants have violated Section 1 because the City of Bryan and TMPA have acted in concert, with the assistance or acquiescence of the other Defendants, to restrain commerce by demanding an unfair wheeling contract. This claim is substantially subsumed in the Section 2 claim and they will be analyzed together.

Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ...". 15 U.S.C. § 2. Section 2 prohibits unilateral activity to monopolize, as well as conspiracies or combination to do so. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2736, 81 L.Ed.2d 628 (1984); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541 (9th Cir.1991), *cert. denied*, 503 U.S. 977, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992). College Station relies on the Clayton Act, § 16, for the injunctive remedy it seeks for these alleged Sherman Act violations.

■ *The State Action Doctrine.*—Defendants contend first and foremost that the state action immunity doctrine bars College Station's antitrust claims. The Court concludes that the state action doctrine does apply to this dispute, and therefore College Station cannot demonstrate a substantial likelihood that it will prevail on the merits of its Sherman and Clayton Act claims.

■ The state action doctrine originated with *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), which held that the Sherman Act does not apply to anticompetitive restraints imposed by the States as an act of government. *Id.* at 350–51. Although *Parker* immunity does not apply directly to local governments, when a municipality's restriction of competition is an authorized im-

plementation of state policy to displace competition, *Parker* immunity will apply. *City of Columbia v. Omni Outdoor Advertising,* 499 U.S. 365, 371, 111 S.Ct. 1344, 1349, 113 L.Ed.2d 382 (1991); *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 38, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). In order to obtain this exemption from the antitrust laws, a municipality must establish that it acts pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition with regulation.[8] *Town of Hallie,* 471 U.S. at 39, 105 S.Ct. at 1716; *see also Paragould Cablevision, Inc. v. City of Paragould, Arkansas,* 930 F.2d 1310, 1312 (8th Cir.), *cert. denied,* 502 U.S. 963, 112 S.Ct. 430, 116 L.Ed.2d 450 (1991) (finding state action immunity as to a city's statutorily authorized entry into the cable televisions business). *Town of Hallie* does not require that the delegating statute explicitly permit the displacement of competition; it is only required that suppression of competition be the "foreseeable result" of what the statute authorizes, *Columbia,* 499 U.S. at 372–73, 111 S.Ct. at 1350, or the "necessary and reasonable consequence" of the state-authorized activity. *Paragould Cablevision,* 930 F.2d at 1312.

In *DFW Metro Line v. Southwestern Bell,* 988 F.2d 601 (5th Cir.), *cert. denied,* 510 U.S. 864, 114 S.Ct. 183, 126 L.Ed.2d 142 (1993), the Fifth Circuit held that Texas' Public Utilities Regulatory Act ("PURA") satisfied the requirement that there be a "clearly articulated" state policy to displace competition.[9]

The legislative intent of the current version of PURA, which regulates electric utilities, among other utilities, was set forth in Section 1.002:

> The legislature finds that traditionally public utilities are by definition monopolies in the areas they serve; that therefore the normal forces of competition which operate to regulate prices in a free enterprise society do not operate; and that therefore utility rates, operations, and services are regulated by public agencies *with the objective that this regulation shall operate as a substitute for competition.*"

TEX.REV.CIV.STAT.ANN. art. 1446c–0 § 1.002 (West Supp.1996) (emphasis added). As to electric utilities, there was additional language which recognizes the emerging role of competition in this regulated industry. While this provision starts by stating that "the purpose of this title is to establish a comprehensive regulatory system," it goes on to note that the wholesale electric industry is "becoming a more competitive industry which does not lend itself to traditional electric utility regulatory rules, policies and principles and that, therefore, the public interest requires that new rules, policies, and principles be formulated and applied to protect the public interest in a more competitive marketplace." TEX.REV.CIV.STAT.ANN. art. 1446c–0 § 2.001(a).

Reading these two provisions together, the Court concludes that the Texas legislature intended to recognize that competition is growing within the electric generating indus-

---

**8.** The Court notes that one Defendant, TMPP, is not a municipality. Therefore, in order to obtain state action immunity, TMPP would be required to establish not only that there be a clearly articulated state policy, but also that the state of Texas "actively supervises" the anticompetitive conduct. *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980); *DFW Metro Line v. Southwestern Bell,* 988 F.2d 601, 605 (5th Cir.), *cert. denied,* 510 U.S. 864, 114 S.Ct. 183, 126 L.Ed.2d 142 (1993). Given Texas' regulation of the electric industry, as discussed below, this requirement probably would be satisfied and, if so, state action immunity would apply to TMPP.

However, it is not necessary to reach this question. College Station's counsel explained to the Court at the outset of the injunction hearing that Defendant TMPP was named only as a necessary

party to ensure that College Station could obtain complete relief. In any event, College Station's only allegation about TMPP was that it was acting in concert with the other Defendants by refusing to sign the Remote Control Area Load ("RCAL") Agreement, which governs the mechanics of the wheeling procedures. The RCAL Agreement between TU and TMPP was executed on December 20, 1995. Therefore, there no longer appears to be any case or controversy in this action involving TMPP.

**9.** The *DFW* Court looked to the Public Utilities Regulatory Act as it then existed, codified at TEX REV.CIV.STAT.ANN. Art. 1446c (West Supp. 1989). The statute has recently been amended by the Texas legislature; however, the current language is substantially the same as that relied upon in *DFW.*

try, but that this competition is to occur within the confines and structure of state regulation.[10] The Court notes that the PUCT now is authorized to order wheeling, so long as consistent with federal regulations. TEX.REV.CIV.STAT.ANN. art. 1446c–0 § 2.056. The PUCT may be changing the paradigm but is continuing in its regulatory role through ongoing efforts to establish a state-wide standard (so-called "postage stamp") rate for wheeling. Furthermore, Texas law authorizes the creation of municipal power agencies such as TMPA for generation, transmission, sale or exchange of electric energy. *See* TEX.REV.CIV.STAT.ANN. art. 1435a–4a(a). These municipal power agencies (like TMPA or the City of Bryan) are empowered to set rates for delivery and transmission of electricity, subject to regulation by the State. TEX.REV.CIV.STAT.ANN. art. 1435a–4a(g) & (h). The Court is convinced that it is the state's intent to continue to regulate electric power generation and transmission. The Court holds that Defendants Bryan and TMPA's imposition of wheeling charges is conduct appropriately within that regulated realm.

Some anti-competitive conduct, such as hard bargaining, therefore was a "foreseeable" result of the State of Texas' electric power policy. Defendants' efforts to ensure that they cover their costs associated with building and operating facilities to transmit electricity as anticipated by the current PUCT regulations. *See* PUCT Substantive Rule § 23.66.

The Court therefore finds that, given the strength of Defendants' argument for state action immunity, College Station has failed to establish a substantial likelihood of success on either of its Sherman Act claims.

***The Essential Facilities Doctrine.***—Furthermore, apart from any affirmative defense asserted by Defendants, College Station has failed to demonstrate a substantial likelihood of success on the merits of its Section 2 claim, the claim on which it appears to rely primarily.

In order to prevail under Section 2, College Station would need to satisfy the "essential facilities" test. The "essential facilities" doctrine provides a means for the federal courts to determine whether antitrust laws have been violated and to enforce the prohibition in Section 2 against monopolies in interstate trade or commerce. A company with monopoly power over an essential facility may not refuse to make the facility available to others where there is no "legitimate business reason" for such refusal. *City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1379 (9th Cir.1992); *MCI Communications v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1133 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

The four part test under the doctrine is as follows:

(1) Defendants are monopolists in control of the essential facility;

(2) Plaintiff's inability to duplicate, practically or reasonably, the facility access;

(3) Defendants have denied plaintiff use of the facility; and,

(4) the feasibility of providing the facility to plaintiff.

*MCI Communications*, 708 F.2d at 1133; *City of Chanute, Kansas v. Williams Natural Gas Co.*, 955 F.2d 641, 647 (10th Cir.), *cert. denied*, 506 U.S. 831, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992); *TCA Building Co. v. Northwestern Resources Co.*, 873 F.Supp. 29,

---

**10.** College Station has cited this Court to *Amtel Communications v. P.U.C. of Texas*, 687 S.W.2d 95, 100–01 (Tex.App.—Austin, 1985, no writ), a case concerning the telecommunications industry which observed that PURA contains "provisions that are distinctly 'antitrust' in nature and reflect a definite public policy *in favor of competition* as a regulating or controlling force applicable to public utilities," and that, in some instances, "PURA does *not* insulate a public utility from the forces of competition and, indeed, prohibits anticompetitive practices by the utility." *Amtel*, 687 S.W.2d at 100 (emphasis in original). However, the *Amtel* Court concluded that, "[g]iven these rather definite and clear pronouncements of competing policies, it cannot reasonably be doubted that the Legislature intended the [Public Utility] Commission to make, where necessary and desirable in the particular case, whatever adjustments and accommodations it considers necessary to effectuate the public interests underlying *both* competition and monopoly power." *Id.* at 101 (emphasis in original).

39 (S.D.Tex.1995). It is College Station's burden to demonstrate the presence of all of these elements. *Williams,* 955 F.2d at 648. While it appears that College Station may well be able to establish the existence of the first, second, and fourth factors, College Station has not established, under the circumstances now presented to the Court, that Defendants have denied it use of their electric transmission lines.

■ To satisfy the requirement that Defendants have denied access to its "essential facility," College Station need not establish outright denial of access or refusal to deal by Defendants. It is sufficient if College Station can demonstrate that Defendants do not offer reasonable terms. *Delaware & Hudson Rwy. v. Consolidated Rail Corp.,* 902 F.2d 174, 179–80 (2d Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991); *City of Chanute,* 955 F.2d at 648 (*citing United States v. Terminal R.R. Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912)).

In this case, the dispute is between two businesses, each maneuvering—understandably—to gain maximum benefit for itself and its taxpayers or constituent cities and their citizens.[11] While the requirement that the monopolist have a "legitimate business reason" cannot be satisfied by the motive of preventing erosion of its monopolistic position, *see Otter Tail Power Co. v. United States,* 410 U.S. 366, 378, 93 S.Ct. 1022, 1030, 35 L.Ed.2d 359 (1973), the courts *have* found a monopolist's goals of discouraging free riding, enhancing its image, or ensuring low costs for its customers to be legitimate business motivations. *See City of Anaheim,* 955 F.2d at 1379–81; *Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 190 (2d Cir. 1992). Furthermore, when the reasonableness of a rate is at issue, the reasonableness standard of the access factor cannot be read to mean that the courts will secure a better deal for an antitrust plaintiff such as College Station. *See Laurel Sand & Gravel, Inc. v. CSX Transportation, Inc.,* 924 F.2d 539, 545 (4th Cir.), *cert. denied,* 502 U.S. 814, 112 S.Ct. 64, 116 L.Ed.2d 39 (1991) (court considered reasonableness of offer from perspective of the monopolist, and held that the reasonableness standard did not guarantee that antitrust plaintiffs would make profit).[12]

■ In this case, given the relatively late formal request for wheeling services, given the absence of prior requests by College Station for wheeling services exclusively, given Defendants' apparent relative inexperience in transmission pricing for large contracts for "unbundled" wheeling services,[13] given the lack of trust generally between the parties due to previously filed litigation (that was still pending), *see* Piwonka Aff. at 1–3, and given the stilted negotiations between the parties due to all sides' posturing, the Court cannot find that Defendants denied College Station access, literally or constructively. TMPA and Bryan have explained in some detail the reasons for the earlier lower estimates for the wheeling charges. White Testimony; Plaintiff's Exhibit 19 (August 1995 worksheet). They have explained their new numbers. White Testimony; Plaintiff's Exhibit 21 (December 1995 worksheets).

**11.** The Ninth Circuit commented on a similar circumstance as follows:

> Put bluntly, [plaintiff cities] desired to benefit their customers at the expense of all the other customers of [the electric utility]. We cannot express surprise at the [c]ities' single-minded desire to benefit their own—it is much like [the utility's] single-minded attention to its rate demands. However, we also cannot say that [the utility's] refusal [to provide the facility] lacked a reasonable business justification.

*City of Anaheim,* 955 F.2d at 1381.

**12.** Furthermore, the courts have recognized that a successful "essential facilities" plaintiff must prove that denial of access has caused it "severe handicap." *Twin Laboratories,* 900 F.2d at 569

(relying on evidence that plaintiff's profits were continuing in finding no severe handicap); *City of Chanute, Kan. v. Williams Natural Gas Co.,* 955 F.2d 641, 648 (10th Cir.1992). A showing of inconvenience or even "some economic loss" is not sufficient. *Twin Labs,* 900 F.2d at 570; *City of Chanute,* 955 F.2d at 648; *Alaska Airlines,* 948 F.2d at 544.

**13.** *Compare* Plaintiff's Exhs. 11 & 12 (the Bryan and TMPA proposed wheeling contracts) (for 127.88 megawatts ("MW")) *with* Plaintiff's Exhs. 34 (agreement between TMPA and Lower Colorado River Authority) (for 35 MW) & 24 (agreement between TMPA and Rayburn Electric Cooperative) (for 42.5 MW). Each contract was based on megawatt mile charges, a rate inapplicable to the parties' needs here.

They have proffered evidence that they viewed the draft contracts (Plaintiff's Exhibits 11 and 12) to be a starting point for negotiations. *See, e.g.,* Defendants' Exhibit 1; Plaintiff's Exhibits 15 & 17. The Court finds these explanations credible.

In sum, College Station has not met its burden to show that TMPA and Bryan lack legitimate business reasons for their respective proposed prices for wheeling services. These Defendants' negotiations with College Station appear to have been designed to maximize Defendants' revenues to cover what they perceive, as of November and December 1995, are the actual costs associated with the transmission lines they have constructed and now operate system wide, including to College Station.[14]

Furthermore, while College Station undoubtedly would prefer to take advantage of favorable changes predicted for the wheeling rate regulations, Defendants' attempt to avoid being affected by such possible changes certainly is not unreasonable. *Compare Twin Laboratories v. Weider Health and Fitness,* 900 F.2d 566, 568 (2d Cir.1990) ("[a]ntitrust law ... does not require one competitor to give another a break just be-

cause failing to do so offends notions of fair play").

Therefore, Defendants did not constructively deny College Station access to its essential facility, and the Court finds that College Station has not demonstrated a substantial likelihood of success on the merits of its Sherman Act claims.

### 2. *Tortious Interference with Contract*

College Station has also claimed that Defendants' conduct amounts to tortious interference with its contract with TU Electric. College Station contends that the TU contract has become substantially burdened by Defendants' conduct, and has lost much of its value to College Station. Under Texas law, the tort of intentional interference with contractual relationships requires proof of the following four elements:

(1) the existence of a contract that was subject to interference,

(2) a willful and intentional act of interference,

(3) such act was a proximate cause of plaintiff's damages, and

(4) actual damage or loss occurred.

---

14. *See Laurel Sand & Gravel, Inc. v. CSX Transportation, Inc.,* 924 F.2d 539, 544 (4th Cir.), *cert. denied,* 502 U.S. 814, 112 S.Ct. 64, 116 L.Ed.2d 39 (1991) (defendant's offer, which was one penny per ton above the defendant's own variable costs, was reasonable); *Delaware and Hudson Rwy.,* 902 F.2d at 180 (genuine issue of material fact existed, so as to require a trial, on the issue of the reasonableness of the defendants' offered price; defendants had demanded a rate amounting to an 800% increase over prior rates).

College Station's expert, Mr. Hadaway, explained that, in his view, the costs sought to be charged by Bryan and TMPA were above those submitted to the PUCT by these entities and by other utilities. He opined that they were above the standard wheeling charges in the industry. He acknowledges that TMPA has recently completed construction that may be responsible for some portion of these Defendants' high fees. He stated his belief that the Defendants' costs were miscalculated; they were too high principally because the costs set forth in Plaintiff's Exhibit 21 (material provided to College Station by Defendants in December, 1995, prior to the suit, to explain the wheeling charges being requested) were based on each of the respective cities' (plus TMPA's expenses in connection with all their transmission facilities. Mr. Hadaway acknowl-

edged that if his assumption (that the individual cities' costs are included in the TMPA figures) were incorrect, then his conclusions as to the inflated level of the TMPA and Bryan rates would be undercut somewhat. He apparently also believes that a more reasonable approach would be for TMPA and Bryan to impose a joint charge that relates to the costs of constructing and operating only these Defendants' transmission lines necessary to wheel power to College Station. He acknowledged that he had little knowledge of the transmission system of TMPA and Bryan as it exists now, since much of his firsthand knowledge of these systems was gained over ten years ago when he worked for the PUCT.

Defendant Gailord White, on behalf of TMPA, established that he personally had made both the earlier, lower (August 1995) calculations and the later computations on which the proposed contracts were based (December 1995). He had discovered in the interim that there were errors in the originally presented figures but the December proposal for TMPA reflected what he then believed, and now believes, are the correct figures for TMPA's own construction and operating costs statewide. It will take significant time and expertise to evaluate those calculations—which is the function of the PUCT or FERC, not this Court.

*Thrift v. Hubbard*, 44 F.3d 348, 356 (5th Cir.1995); *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 939 (Tex.1991).

■ The record contains no evidence of active interference by Defendants with the TU–College Station contract. Rather, College Station's proof establishes at best that Defendants TMPA and Bryan wanted to commence negotiations for a wheeling contract (Plaintiff's Exhibit 13) and that they have been trying to maintain a favorable price and a long-term, fixed rate contract. This does not amount to intentional interference.[15] As to price, even Plaintiff College Station concedes that there would be some savings from the expiring TMPA wholesale contract if it agreed to the proposed wheeling contracts. Pohl Testimony. College Station simply believes that it is entitled to more savings. *Id.* As to the regulatory appeal issue, College Station has been uncompromising in its demand for the freedom to seek agency rate rulings to the potential disadvantage of Defendants. (Indeed, this insistence has paid off, since Defendants at the hearing agreed to delete the primary offending language from their proposal.) In any event, Defendant TMPA's prior position does not seem unreasonable; TMPA apparently has obtained similar provisions preventing parties from seeking agency review in at least one other recent wheeling contract.[16] Aggressive negotiation, without more, does not amount to tortious interference with contract. The Court, however, does not need to reach any final conclusions on the issue of Defendants' intentional acts of interference at this time.

■ Defendants have met their burden of demonstrating the affirmative defense that their conduct was justified legally. It is an affirmative defense to a tortious interference claim if a defendant's conduct was within its exercise of the privilege of legal justification or excuse. *Victoria Bank & Trust*, 811 S.W.2d at 939. Under this defense, a party may interfere with another's contractual relations if (1) it is done in a bona fide exercise of its own rights, or (2) it has an equal or superior right in the subject matter to that of the other party. *Id.; Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 691 (Tex.1989).

■ The Court finds that Defendants have made an adequate showing that they are entitled to this defense. In their negotiations with College Station, Defendants have relied upon their currently existing rights, including the right to "pancake" their rates [17] and the right to calculate wheeling rates using an embedded cost method, acceptable under Public Utility Commission Substantive Rule § 23.66. While differences in the manner of calculation are within the province of rate experts, Defendant TMPA's representative established that he used the accepted method of calculation, at least superficially. The Court cannot find a basis to conclude that Defendants have acted beyond their rights as owners of transmission facilities. Attempts by Defendants to lock in a rate for the term of College Station's contract with TU, and to avoid the effects of future regulatory changes that could harm owners of electric transmission lines, are actions taken in a bona fide exercise of Defendants' own rights.

Therefore, College Station has failed to establish a substantial likelihood that it will succeed on its tortious interference claim.[18]

---

15. It does not appear that Defendants' conduct has interfered with the TU contract to date. The problem seems to be College Station's insistence on wheeling rates that it deems to be the market rate (without regard to Defendants' particular circumstances).

16. *See, e.g.*, Plaintiff's Exh. 34 (TMPA Agreement for Transmission Wheeling Service with Lower Colorado River Authority, May 3, 1995), ¶¶ 8.1, 8.2.

17. *See* Defendants' Exhibit # 4 (PUCT Substantive Rules), § 23.66(d)(5)(B).

18. Defendants also argue that, as municipal corporations and officials acting within the course and scope of their duties, they are immune from tort claims, citing *Kelly v. Galveston County*, 520 S.W.2d 507 (Tex.Civ.App.—Houston [14th Dist.] 1975, no writ). The Court does not reach this issue, although it may have merit. To the extent Defendants intend to pursue this line of argument, they may submit additional authorities as indicated at the end of this order.

### Substantial Threat of Irreparable Injury

College Station must establish that there is a substantial threat that irreparable injury will result if this Court does not grant the requested injunction. College Station argues in its Complaint that Defendants' denial of access to its transmission lines will cause irreparable harm to College Station in that, "among other things":

(1) any interference with, cessation, or disruption of the flow of electric power and energy to College Station would have immeasurable economic consequences or, alternatively, cost College Station the difference between the wheeling charges Bryan/TMPA seek to impose and fair and reasonable charges,

(2) in light of the Local Government Antitrust Immunity Act of 1984, 15 U.S.C. § 34–36, which bars recovery of *damages* under the Clayton Act from any local government, or official or employee thereof acting in an official capacity, College Station does not have an adequate remedy at law to recover damages (*e.g.*, overcharges) caused by Defendants' unlawful conduct, and

(3) if TU Electric, after being frustrated by Defendants' conduct, elects to cancel the TU Electric Contract, College Station would not likely have any viable alternative other than to do business with Bryan/TMPA at the prices and on the terms and conditions dictated by Bryan/TMPA.

Complaint at 20–21 (emphasis in original).

The first instance of irreparable harm identified by College Station has been mitigated substantially if not mooted by Defendants' commitments made since this action was filed.

College Station first argues that, despite Defendants' repeated assurances to College Station and the Court that Defendants will not interrupt the flow of power to College Station and that Defendants will ensure that the transfers from TMPA's generators to TU's facilities are implemented smoothly, College Station is still exposed to power interruptions after midnight on December 31, 1995. College Station asserts that no one can determine whether Defendants, or a single recalcitrant employee of one Defendant, will somehow interfere with the energy flow to the City of College Station. The Court is unpersuaded. Defendants' representatives stated unequivocally in open court on December 20, 1995, that there will be no interference with transmission of electricity to College Station, whether or not a written or other transmission agreement is in place, and that there will be no interruption of power so long as TU provides TMPP with the necessary instructions to implement the load transfer. This commitment appears fully reliable and credible. Mr. Townsend, a manager at TMPP, had stated previously in his testimony that a written contract was unnecessary as far as he was concerned.[19]

Second, Defendants TMPA and Bryan have agreed to delete from their proposed contracts § 9.5(b) and the second sentence of § 9.5(a),[20] the provisions that would have prohibited College Station from seeking regulatory review of the contractual wheeling rate.[21] In fact, College Station has already

---

**19.** The Court announced to the parties that it accepted and would be relying upon Defendants' and their counsel's representations, and that Defendants would be held to these promises.

**20.** This sentence (which is a good summary of these disputed provisions generally) was: "It is specifically understood and agreed by the Parties the rates and charges specified in this Agreement shall remain in effect during the term of this Agreement and shall not be subject to change by any Party through application to the FERC pursuant to [various provisions] of the Federal Power Act or otherwise, or through application to the PUCT pursuant to provisions of the Public Utility Regulatory Act, or otherwise." The Defendants, however, did not offer to delete the following sentence, which provided: "It is the intention of the Parties that this Agreement shall in all events continue in effect in accordance with its terms until terminated or canceled in accordance with the provisions hereof." Thus, College Station argues that Defendants will retain arguments that may prevent retroactivity and therefore College Station will be prejudiced before the regulatory agencies if it enters into any wheeling contract.

**21.** Defendants clarified before this Court on December 19th that their position is that either side should be able to seek any relief it wishes from PUC and FERC. Defendants specifically stated

sought a ruling from FERC (Plaintiff's Exhibit 22) and has stated that it intended to file with the PUCT shortly, to obtain a determination of a "fair and reasonable charge."

College Station argues that the administrative relief may not be retroactive, even if FERC or the PUCT makes a rate determination that lowers the applicable wheeling charges among these parties' facilities. In that event, College Station's residents may be required for the period from January 1, 1996, to the effective date of the ruling to pay more that the rate ultimately approved. However, the Court does not consider this circumstance sufficient to meet the irreparable injury requirement necessary for a preliminary injunction. College Station is now free to seek a retroactive application of any new rate applied by the agency. To the extent the regulatory agency with jurisdiction over the wheeling rate declines to grant retroactive relief, the agency is expressing a policy determination that the Court must presume is within the realm of the regulatory function, the reason for deference to the agency in the first place.[22] Moreover, Congress has determined that money damages are unavailable under the Clayton Act for antitrust claims against municipal entities. LOCAL GOV'T ANTITRUST ACT OF 1984, 15 U.S.C.A. §§ 34–36 (West Supp.1995). This is a significant expression of legislative policy. The Court does not find it appropriate—if even permissible—to ignore this mandate under the guise of a finding of irreparable

injury based on incrementally increased rates.[23]

College Station also argues that FERC or the PUCT may lack authority to issue a retroactive determination and thus its ability to seek review is hollow. The parties expressed uncertainty on this point and the cases cited do not adequately address the matter. Each case College Station cited to the Court involves "filed rates", which are not the circumstances presented here. *See Gulf States Utilities Co. v. Alabama Power Co.*, 824 F.2d 1465, 1468–71 (5th Cir.1987); *Public Utility Commission of Texas v. GTE–Southwest, Inc.*, 901 S.W.2d 401, 404–05 (Tex. 1995). Other provisions of the enabling legislation for these regulatory agencies do allow retroactive rate adjustments. *See, e.g.*, TEX.REV.CIV.STAT.ANN. Art. 1446c, § 43(f).

The Court is similarly unpersuaded by College Station's argument that irreparable injury is likely because refunds (in the event of College Station's success in the rate proceeding) would be difficult due to the high turnover of electric utility accounts in its city resulting from a large population of college students. Piwonka Aff. at 3–4. If it is important to College Station to make refunds available to its utility customers, it may do so through various means. For instance, it may insert notices in the utility bills and issue public service announcements in the press alerting the public to the issue. If consumers want the refunds, they can ask for them;

that they were not agreeing that a FERC rate established some time in the future could become retroactive to January 1, 1996, and that they would argue before the agencies that the contract in effect between the parties would prohibit the agencies from ordering that a rate be effective retroactively. *See also* "Defendants' Brief Supporting Their Motion That Plaintiff's Motion for Injunction Be Denied, and Supporting Their Motion to Dismiss, or in the Alternative, Motion to Stay," at 2 n. 1.

**22.** While it is not entirely clear whether or not FERC could order such retroactive relief in this context, the courts have recognized that Commission has the power to act in the interest of equity and, in some situations, to grant retroactive relief. *See, e.g. Mid Louisiana Gas Co. v. F.E.R.C.*, 780 F.2d 1238, 1247 & n. 13 (gas company may file with FERC to retroactively recover rates for period between effective date of statute and

FERC orders); *Texas Eastern Transmission Corp. v. F.E.R.C.*, 769 F.2d 1053 (5th Cir.1985), *cert. denied*, 476 U.S. 1114, 106 S.Ct. 1968, 90 L.Ed.2d 652 (1986) (FERC may act in equity to decide whether or not to make production-related allowances retroactive). *Compare Gulf States Utilities v. Alabama Power Co.*, 824 F.2d 1465, 1471 (5th Cir.) (contracting party may not sue to change a filed rate, and FERC may not order retroactive alterations or reparations for such a rate), *amended on other grounds*, 831 F.2d 557 (1987).

**23.** To the extent that the court in *Pine Ridge Recycling, Inc. v. Butts County, Georgia*, 864 F.Supp. 1338, 1342 (M.D.Ga.1994), reached a contrary result, this Court declines to follow that lead. Moreover, since it is unlikely that College Station would succeed on the merits of its antitrust claims for the reasons set forth above, this issue is academic.

if they deem refunds unimportant, then College Station should not concern itself with the matter on those people's behalf.

■ The last example of irreparable harm identified by College Station is that the lack of a wheeling agreement may cause TU to cancel its contract with College Station, and inure to Defendants' benefit by enabling them to force College Station to obtain their power from Bryan and TMPA at inflated prices, and on unfair terms and conditions. This claim is entirely unsupported by the record. Whatever might have been the situation before this action was filed, it is clear now that Defendants are willing to negotiate and, indeed, have made important concessions.[24] Furthermore, TU has not made an appearance before this Court to express any concern.

Fundamentally, the evidence of record is that Defendants Bryan and TMPA's proposed wheeling rates may cut into the savings that College Station had initially expected to enjoy when it entered a contract with TU instead of continuing with the TMPA/Bryan wholesale power contract. College Station's customers nevertheless will achieve some savings over the previous contract, even in the unlikely event that College Station must pay the wheeling rate originally quoted by TMPA and Bryan.

Therefore, the Court is not persuaded that Defendants Bryan and TMPA's contracts, especially as they already have been modified, would cause College Station to suffer irreparable injury cognizable by the Court as a basis to issue a preliminary injunction.

*Public Interest*

Finally, College Station must establish that granting the preliminary injunction will "not disserve the public interest." College Station argues that Defendants' conduct will harm its residents' interest if College Station cannot purchase lower cost electric power from TU, because College Station's customers will suffer higher prices and, due to College Station's student population and high turnover rate for utility accounts, it is "virtually impossible" to rebate overcharges to the customers. Complaint, at 21–22.

■ The turnover issue is discussed above and is not deemed a significant factor here. Moreover, "the public interest" is a broader term than argued by College Station. There are residents and taxpayers of the Defendant entities and cities who share the interest of covering their costs of constructing and operating their transmission lines, including those to College Station. These interests also must be considered by the Court.

Overall, the broadest public interest would be served by the parties reaching a fair contractual rate for all communities involved. The injunction requested by College Station would benefit certain portions of the public, but not all. The Court cannot determine on this record whether an injunction would serve or disserve the public interest, and therefore College Station has not sustained its burden on this factor.

### CONCLUSION

In summary, this Court must look at the facts in existence at the time that the injunction would issue. The circumstances now presented do not support the issuance of the extraordinary relief College Station seeks. The requested injunction is sought on the basis of local views about what a fair wheeling contract price and term should be, in light of potential significant regulatory changes. It is unfortunate for College Station that its wheeling and energy supply contracts must be negotiated at this time, but Plaintiff cannot expect suppliers to act in College Station's interests rather than their own. One who purchases a car, camera or laptop computer cannot expect a refund as a matter of right when, months or a year after the sale, the price of the purchased item drops.

Furthermore, the Court has no reasoned basis to set the requested interim rates, even if it were inclined to do so. Finally, if the

---

24. It is possible that the parties may reach a contract for a shorter term than the entire period of the TU–College Station agreement. Defendants' counsel indicated on the record at the hearing that his clients may negotiate on this issue; however, College Station has not to the Court's knowledge expressed any willingness to pursue this course.

894

federal judiciary were to do so in one feud between negotiating parties, where would the involvement end when other similar disputants make such requests?

The Court thus finds that College Station has not established a substantial likelihood of success on the merits of its claims, a clear showing of irreparable injury, or that an injunction would aid the public interest generally.

Therefore, it is **ORDERED** that College Station's application for a preliminary injunction is **DENIED**.

The Defendants also seek dismissal of the Complaint on the basis of primary jurisdiction and sovereign immunity doctrines. The Court is not prepared to take this step on the basis of the briefing and record before it. It is therefore **FURTHER ORDERED** that the **parties file on or before January 19, 1996, additional memoranda of law in support of any additional relief** sought in light of this decision, citing authorities that govern whether the case should be retained on the Court's docket, stayed and/or dismissed pending disposition of College Station's applications to the regulatory agencies.